# CSX TRANSPORTATION, INC. *v.* EASTERWOOD

No. 91–790.   Argued January 12, 1993—Decided April 21, 1993*

---

*Together with No. 91–1206, *Easterwood* v. *CSX Transportation, Inc.*, also on certiorari to the same court.

WHITE, J., delivered the opinion for a unanimous Court with respect to Parts I and II, and the opinion of the Court with respect to Parts III and IV, in which REHNQUIST, C. J., and BLACKMUN, STEVENS, O'CONNOR,

SCALIA, and KENNEDY, JJ., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which SOUTER, J., joined, *post*, p. 676.

*Howard J. Trienens* argued the cause for petitioner in No. 91–790 and respondent in No. 91–1206. With him on the briefs were *Carter G. Phillips, Mark E. Haddad, Jack H. Senterfitt,* and *Richard T. Fulton.*

*Tambra Pannell Colston* argued the cause *pro hac vice* for respondent in No. 91–790 and petitioner in No. 91–1206. With her on the brief were *James I. Parker* and *William L. Lundy.*

*Deputy Solicitor General Mahoney* argued the cause for the United States urging affirmance in both cases. With her on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, William Kanter, Paul M. Geier,* and *Dale C. Andrews.*†

†Briefs of *amici curiae* urging affirmance were filed for the State of Ohio et al. by *Lee Fisher,* Attorney General of Ohio, and *Nancy J. Miller,* Deputy Chief Counsel, and by the Attorneys General for their respective jurisdictions as follows: *Winston Bryant* of Arkansas, *Richard Blumenthal* of Connecticut, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Ronald W. Burris* of Illinois, *Bonnie J. Campbell* of Iowa, *Scott Harshbarger* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Marc Racicot* of Montana, *Frankie Sue Del Papa* of Nevada, *Tom Udall* of New Mexico, *Ernest D. Preate, Jr.,* of Pennsylvania, *Dan Morales* of Texas, and *Joseph B. Meyer* of Wyoming; for the American Automobile Association by *Paul R. Verkuil;* for the Railway Labor Executives' Association by *Lawrence M. Mann;* and for Cynthia Wilson Pryor by *J. N. Raines.*

Briefs of *amici curiae* were filed for the Association of American Railroads by *John H. Broadley, Donald B. Verrilli, Jr., John B. Morris, Jr.,* and *Robert W. Blanchette;* for the Association of Trial Lawyers of America et al. by *Dale Haralson, Roxanne Barton Conlin, Jeffrey Robert White,* and *Arthur H. Bryant;* for the American Trucking Associations, Inc., et al. by *Daniel R. Barney, David A. Strauss, Richard A. Allen,* and *Charles A. Webb;* for the National Conference of State Legislatures et al. by *Richard Ruda* and *Scott L. Nelson;* for the National Railroad Passenger Corp. by *Paul F. Mickey, Jr., Alvin Dunn,* and *Stephen C. Rogers;* and for the Texas Class I Railroads et al. by *Paul A. Cunningham, Gerald P. Norton, Carolyn F. Corwin,* and *Robert Brian Burns, Jr.*

JUSTICE WHITE delivered the opinion of the Court.

Thomas Easterwood was killed on February 24, 1988 when a train owned and operated by petitioner and cross-respondent CSX Transportation, Inc., collided with the truck he was driving at the Cook Street crossing in Cartersville, Georgia. His widow, respondent and cross-petitioner Lizzie Easterwood, brought this diversity wrongful-death action, which alleges, *inter alia,* that CSX was negligent under Georgia law for failing to maintain adequate warning devices at the crossing and for operating the train at an excessive speed. The issue before the Court is the extent to which the Federal Railroad Safety Act of 1970 (FRSA), 84 Stat. 971, as amended, 45 U. S. C. §§ 421–447 (1988 ed. and Supp. II), pre-empts these claims.

The District Court for the Northern District of Georgia granted summary judgment for CSX on the ground that both claims were pre-empted. 742 F. Supp. 676, 678 (1990). The Court of Appeals for the Eleventh Circuit affirmed in part and reversed in part, holding that respondent's allegation of negligence based on the train's speed was pre-empted, but that the claim based on the absence of proper warning devices was not. 933 F. 2d 1548, 1553–1556 (1991). Because Courts of Appeals have differed over the pre-emptive effect of FRSA on negligence suits against railroads, we granted the petitions of both parties. 505 U. S. 1217 (1992).[1] We now affirm.

I

FRSA was enacted in 1970 "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons . . . ." 45 U. S. C. § 421. To aid in the achievement of these goals,

---

[1] See *Karl* v. *Burlington Northern R. Co.,* 880 F. 2d 68, 75–76 (CA8 1989); *Marshall* v. *Burlington Northern, Inc.,* 720 F. 2d 1149, 1154 (CA9 1983); *Hatfield* v. *Burlington Northern R. Co.,* 958 F. 2d 320, 321 (CA10 1992).

the Act specifically directs the Secretary of Transportation to study and develop solutions to safety problems posed by grade crossings. § 433. In addition, the Secretary is given broad powers to "prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety . . . ." § 431(a). The pre-emptive effect of these regulations is governed by § 434, which contains express saving and pre-emption clauses.[2] Thus, the States are permitted to "adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement." Even after federal standards have been promulgated, the States may adopt more stringent safety requirements "when necessary to eliminate or reduce an essentially local safety hazard," if those standards are "not incompatible with" federal laws or regulations and not an undue burden on interstate commerce.

In 1971, the Secretary, acting through the Federal Railroad Administration (FRA), promulgated regulations under FRSA setting maximum train speeds for different classes of track. See 49 CFR § 213.9 (1992). Also in 1971, and again in 1972, the Secretary duly reported to Congress on the

---

[2] The section reads:

"§ 434. National uniformity of laws, rules, regulations, orders, and standards relating to railroad safety; State regulation

"The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce."

problem of grade crossings and on possible solutions.[3] Congress responded by enacting the Highway Safety Act of 1973, Title II of the Act of Aug. 13, 1973, 87 Stat. 282, as amended, note following 23 U. S. C. § 130. This Act makes federal funds available to the States to improve grade crossings, in return for which the States must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U. S. C. § 130(d). Further conditions on the States' use of federal aid to improve grade crossings have been set out in regulations promulgated by the Secretary through the Federal Highway Administration (FHWA) under FRSA and the Highway Safety Act. See 23 CFR pts. 646, 655, 924, 1204 (1992). It is petitioner's contention that the Secretary's speed and grade crossing regulations "cove[r] the subject matter" of, and therefore pre-empt, the state law on which respondent relies.[4]

Where a state statute conflicts with, or frustrates, federal law, the former must give way. U. S. Const., Art. VI, cl. 2; *Maryland* v. *Louisiana*, 451 U. S. 725, 746 (1981). In the

---

[3] See U. S. Dept. of Transportation, Railroad-Highway Safety, Part I: A Comprehensive Statement of the Problem (1971); U. S. Dept. of Transportation, Railroad-Highway Safety, Part II: Recommendations for Resolving the Problem (1972).

[4] The Court of Appeals found that, because the grade crossing regulations were promulgated pursuant to the Highway Safety Act (rather than FRSA), their pre-emptive effect is not governed by § 434. 933 F. 2d 1548, 1555 (CA11 1991). As petitioner notes, this distinction does not apply to 23 CFR pts. 646 and 1204, which were promulgated under the authority of both statutes. See Brief for Petitioner in No. 91–790, p. 36. In any event, the plain terms of § 434 do not limit the application of its express pre-emption clause to regulations adopted by the Secretary pursuant to FRSA. Instead, they state that any regulation "adopted" by the Secretary may have pre-emptive effect, regardless of the enabling legislation. At the very least, the Court of Appeals' conclusion is inappropriate with respect to regulations issued under 23 U. S. C. § 130, given that the latter is a direct outgrowth of FRSA.

interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95 (1983). If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.

According to § 434, applicable federal regulations may pre-empt any state "law, rule, regulation, order, or standard relating to railroad safety." Legal duties imposed on railroads by the common law fall within the scope of these broad phrases. Cf. *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 522 (1992) (federal statute barring additional "'require-ment[s]' . . . 'imposed under State law'" pre-empts common-law claims); *id.*, at 548–549 (SCALIA, J., concurring in judgment in part and dissenting in part) (same). Thus, the issue before the Court is whether the Secretary of Transportation has issued regulations covering the same subject matter as Georgia negligence law pertaining to the maintenance of, and the operation of trains at, grade crossings. To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter, cf. *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 383–384 (1992) (statute's use of "relating to" confers broad pre-emptive effect), for "covering" is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law. See Webster's Third New International Dictionary 524 (1961) (in the phrase "policy clauses covering the situation," cover means "to com-

prise, include, or embrace in an effective scope of treatment or operation"). The term "covering" is in turn employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses. See *supra*, at 662.

II

After filing an answer denying the allegations of negligence with respect to the warning devices at Cook Street and with respect to the train's speed, petitioner moved for summary judgment on the ground that these claims were pre-empted. As the litigation comes to us, petitioner does not assert that the complaint fails to state a claim under Georgia law. The sole issue here is pre-emption, which depends on whether the regulations issued by the Secretary cover the subject matter of the two allegations, each of which we may assume states a valid cause of action.[5]

As indicated above, the Secretary of Transportation has addressed grade crossing safety through a series of regulations. Each State receiving federal aid is required to establish a "highway safety improvement program" that establishes priorities for addressing all manner of highway hazards and guides the implementation and evaluation of

---

[5] Because the litigation comes to us in this posture, neither party provides a description of Georgia statute or case law dealing with train speeds or the duties of railroads with respect to grade crossings. However, we note that Georgia Code Ann. § 32–6–190 (1991) provides that railroads are under a duty to maintain their grade crossings "in such condition as to permit the safe and convenient passage of public traffic." While final authority for the installation of particular safety devices at grade crossings has long rested with state and local governments, see, *e. g.*, § 40–6–25, this allocation of authority apparently does not relieve the railroads of their duty to take all reasonable precautions to maintain grade crossing safety, *Southern R. Co.* v. *Georgia Kraft Co.*, 188 Ga. App. 623, 624, 373 S. E. 2d 774, 776 (1988), including, for example, identifying and bringing to the attention of the relevant authorities dangers posed by particular crossings.

remedial measures. 23 CFR pt. 924 (1992).[6] In setting priorities, the States are directed to consider and rank the dangers posed by grade crossings. § 924.9(a)(4). Having developed a program, each State must evaluate its effectiveness and costs, § 924.13, and file yearly reports with the FHWA, § 924.15.

States are subject to further regulations governing the use of particular warning devices. For all projects, they must employ devices that conform to standards set out in FHWA's Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD or Manual).[7] §§ 646.214(b)(1), 655.603. In addition, for projects that involve grade crossings "located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of [an] existing roadway," see § 646.214(b)(2), or in which "Federal-aid funds participate in the installation of the [warning] devices," regulations specify warning devices that must be installed. See §§ 646.214(b)(3) and (4). Thus, States must employ automatic gates with flashing light signals as part of any improvement project that concerns a crossing that features, *inter alia*, multiple tracks, high speed trains operating in areas of limited visibility, heavy vehicle or train traffic, or if a diagnostic team made up of "representatives of the parties of interest in [the crossing]," § 646.204(g), recommends them.[8] For federally funded installations at cross-

---

[6] Parallel provisions require state programs to systematically identify hazardous crossings and to develop "a program for the elimination of hazards." 23 CFR § 1204.4 (1992), Highway Safety Program Guideline No. 12(G).

[7] U. S. Dept. of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices for Streets and Highways (1988). The Manual has been incorporated into federal regulations promulgated by the Secretary. See 23 CFR §§ 655.601–655.603 (1992).

[8] 23 CFR § 646.214(b)(3) reads:

"(3)(i) *Adequate warning devices* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are

ings that do not present the track conditions specified in § 646.214(b)(3), "the type of warning device to be installed, whether the determination is made by a State . . . agency, and/or the railroad, is subject to the approval of the FHWA." § 646.214(b)(4).

The regulations of 23 CFR pt. 924 do not of themselves support petitioner's claim of pre-emption. These provisions establish the general terms of the bargain between the Federal and State Governments: The States may obtain federal funds if they take certain steps to ensure that the funds are efficiently spent. On its face, this federal effort to encourage the States to rationalize their decisionmaking has little to say about the subject matter of negligence law, because, with respect to grade crossing safety, the responsibilities of railroads and the State are, and traditionally have been, quite distinct. Before the enactment of FRSA, for example, Georgia's authority over grade crossing improvements did not excuse a railroad's liability in negligence for failing to maintain a safe crossing, see n. 5, *supra*, just as a jury finding

---

to include automatic gates with flashing light signals when one or more of the following conditions exist:

"(A) Multiple main line railroad tracks.

"(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

"(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

"(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

"(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

"(F) A diagnostic team recommends them.

"(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable."

For the definition of "diagnostic team," see 23 CFR § 646.204(g) (1992).

of railroad negligence bore no particular significance on the State's safety efforts beyond that which the State wished to give it. Certainly there is no explicit indication in the regulations of 23 CFR pt. 924 that the terms of the Federal Government's bargain with the States require modification of this regime of separate spheres of responsibility. And, contrary to the view of the Court of Appeals for the Tenth Circuit, it does not necessarily follow that "[t]he hit-or-miss common law method runs counter to a statutory scheme of planned prioritization." *Hatfield* v. *Burlington Northern R. Co.*, 958 F. 2d 320, 324 (1992). In fact, the scheme of negligence liability could just as easily complement these regulations by encouraging railroads—the entities arguably most familiar with crossing conditions—to provide current and complete information to the state agency responsible for determining priorities for improvement projects in accordance with § 924.9. In light of the relatively stringent standard set by the language of § 434 and the presumption against preemption, and given that the regulations provide no affirmative indication of their effect on negligence law, we are not prepared to find pre-emption solely on the strength of the general mandates of 23 CFR pt. 924.

Likewise, the requirement that the States comply with the MUTCD does not cover the subject matter of the tort law of grade crossings. Petitioner's contrary reading rests primarily on language that appears in Part VIII of the Manual, entitled "Traffic Control Systems for Railroad-Highway Grade Crossings":

> "[T]he highway agency and the railroad company are entitled to jointly occupy the right-of-way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad. The determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority. Subject to such determination and selection, the design, installa-

tion and operation shall be in accordance with the national standards contained herein." Manual, at 8A–1.[9]

According to petitioner, the third sentence of this paragraph, combined with the directive in 23 CFR § 646.214(b)(1) that the States comply with the Manual, amounts to a determination by the Secretary that state governmental bodies shall bear exclusive responsibility for grade crossing safety.

Petitioner's argument suffers from an initial implausibility: It asserts that established state negligence law has been implicitly displaced by means of an elliptical reference in a Government Manual otherwise devoted to describing for the benefit of state employees the proper size, color, and shape of traffic signs and signals. Not surprisingly, the Manual itself disavows any such pretensions: "It is the intent that the provisions of this Manual be standards for traffic control devices installation, but not a legal requirement for installation." Manual, at 1A–4. The language on which petitioner relies undermines rather than supports its claim by acknowledging that the States must approve the installation of any protective device even as the railroads maintain "joint responsibility" for traffic safety at crossings. As is made clear in the FHWA's guide to the Manual, the MUTCD provides a description of, rather than a prescription for, the allocation of responsibility for grade crossing safety between the Federal and State Governments and between States and railroads:

---

[9] Petitioner also notes similar language contained in the Manual, at 8D–1:

"The selection of traffic control devices at a grade crossing is determined by public agencies having jurisdictional responsibility at specific locations.

.　　　.　　　.　　　.　　　.

". . . Before a new or modified grade crossing traffic control system is installed, approval is required from the appropriate agency within a given State."

"8A–6 Grade-Crossing Responsibility

"Jurisdiction

   "Jurisdiction over railroad-highway crossings resides almost exclusively in the States.   Within some States, responsibility is frequently divided among several public agencies and the railroad."   U. S. Dept. of Transportation, Federal Highway Administration, Traffic Control Devices Handbook (1983).

Rather than establishing an alternative scheme of duties incompatible with existing Georgia negligence law, the Manual disavows any claim to cover the subject matter of that body of law.

   The remaining potential sources of pre-emption are the provisions of 23 CFR §§ 646.214(b)(3) and (4), which, unlike the foregoing provisions, do establish requirements as to the installation of particular warning devices.   Examination of these regulations demonstrates that, when they are applicable, state tort law is pre-empted.   However, petitioner has failed to establish that the regulations apply to these cases, and hence we find respondent's grade crossing claim is not pre-empted.

   As discussed *supra*, at 666–667, under §§ 646.214(b)(3) and (4), a project for the improvement of a grade crossing must either include an automatic gate or receive FHWA approval if federal funds "participate in the installation of the [warning] devices."[10]   Thus, unlike the Manual, §§ 646.214(b)(3) and (4) displace state and private decision-making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained.   Indeed, §§ 646.214(b)(3) and (4) effectively set the terms under which railroads are to participate in the improvement of crossings.   The former section

---

[10] As petitioner has not suggested that the Cook Street crossing is located in, or near the terminus of, a federal-aid highway project, the issue of the proper application of 23 CFR § 646.214(b)(2) (1992) is not before us.

envisions railroad involvement in the selection of warning devices through their participation in diagnostic teams which may recommend the use or nonuse of crossing gates. §§ 646.214(b)(3)(i)(F) and (3)(ii). Likewise, § 646.214(b)(4), which covers federally funded installations at crossings that do not feature multiple tracks, heavy traffic, or the like, explicitly notes that railroad participation in the initial determination of "the type of warning device to be installed" at particular crossings is subject to the Secretary's approval. In either case, the Secretary has determined that the railroads shall not be made to pay any portion of installation costs. § 646.210(b)(1). In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

The remaining question with respect to respondent's grade crossing claim is whether the preconditions for the application of either regulation have been met. A review of the record reveals that they have not. Petitioner relies on an affidavit from an engineer for the Georgia Department of Transportation (DOT) which was submitted in support of its motion for summary judgment. The affidavit indicates that, in 1979–1980, the DOT decided to install a crossing gate at the West Avenue crossing in Cartersville. That gate could not be installed, however, without placing motion-detection devices at four adjacent crossings, including Cook Street. App. 16. The DOT therefore installed new circuitry at each crossing, and subsequently installed gates at West Avenue and each of the adjacent crossings except Cook Street. Although a gate was also planned for Cook Street and funds set aside for the project, no other devices were installed because the street's width required the construction of a traffic

island, which in turn required city approval. When the city declined to approve the island out of concern for the flow of vehicular traffic, the plan for the gate was shelved and the funds allocated for use in another project.

These facts do not establish that federal funds "partici-pate[d] in the installation of the [warning] devices" at Cook Street. The only equipment installed was the motion-detection circuitry. Such circuitry does not meet the defini-tion of warning devices provided in 23 CFR §§ 646.204(i) and (j) (1992).[11] Petitioner nevertheless contends that the Cook Street crossing was part of a single project to improve the five Cartersville crossings, and that the regulations were ap-plicable because federal funds participated in the installation of gates at the other four crossings. Reply Brief for Peti-tioner in No. 91–790, p. 20. Neither party identifies any statutory or regulatory provisions defining the term "proj-ect," although some usages cast doubt on petitioner's view. See, e. g., 23 CFR § 646.210(c)(3) (describing the elimination of "a grade crossing" as "the . . . project"). Even if the term could be construed to include either individual or multiple crossing projects, it is clear that the Georgia DOT treated the installation of warning devices at West Avenue and Cook Street as distinct projects. Respondent's own affiant states that the cost of the motion detector installed at Cook Street "was included in the estimated costs proposal prepared . . . for the West Avenue crossing improvements . . . ." App. 17.

---

[11] The relevant definitions state:

"(i) *Passive warning devices* means those types of traffic control de-vices, including signs, markings and other devices, located at or in advance of grade crossings *to indicate the presence of a crossing* but which do not change aspect upon the approach or presence of a train.

"(j) *Active warning devices* means those traffic control devices activated by the approach or presence of a train, such as flashing light signals, auto-matic gates and similar devices, as well as manually operated devices and crossing watchmen, *all of which display to motorists positive warning of the approach or presence of a train.*" 23 CFR §§ 646.204(i) and (j) (emphases added).

Moreover, as found by the District Court, when Cartersville scotched the plans for the Cook Street gate, "the funds earmarked for this crossing were . . . transferred to other projects. The decision to install gate arms at the Cook Street crossing was placed on a list of projects to be considered at a later time." 742 F. Supp., at 678. In light of the inapplicability of §§ 646.214(b)(3) and (4) to these cases, we conclude that respondent's grade crossing claim is not pre-empted.[12]

## III

Federal regulations issued by the Secretary pursuant to FRSA and codified at 49 CFR § 213.9(a) (1992) set maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel. The different classes of track are in turn defined by, *inter alia*, their gage, alinement, curvature, surface uniformity, and the number of crossties per length of track. See §§ 213.51–213.143. The track at the Cook Street crossing is class four, for which the maximum speed is 60 miles per hour. Although respondent concedes that petitioner's train was traveling at less than 60 miles per hour,[13] she nevertheless contends that petitioner breached its common-law duty to operate its train at a moderate and safe rate of speed. See, *e. g., Central of Georgia R. Co.* v. *Markert,* 200 Ga. App. 851, 852; 410 S. E. 2d 437, 438, cert. denied, 200 Ga. App. 895 (1991). Petitioner contends that this claim is pre-empted because the federal speed limits are regulations covering the subject matter of the common law of train speed.

---

[12] We reject petitioner's claim of implied "conflict" pre-emption, Brief for Petitioner in No. 91–790, pp. 40–43, on the basis of the preceding analysis. Of course we express no opinion on how the state-law suit against the railroad should come out in light of the decisions taken by Cartersville and the Georgia DOT with respect to the Cook Street project.

[13] Affidavits submitted by the parties indicate that the train was moving at a rate of 32 to 50 miles per hour.

On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.

Because the conduct of the automobile driver is the major variable in grade crossing accidents, and because trains offer far fewer opportunities for regulatory control, the safety regulations established by the Secretary concentrate on providing clear and accurate warnings of the approach of oncoming trains to drivers.[14] Accordingly, the Secretary's regulations focus on providing appropriate warnings given variations in train speed. The MUTCD, for example, requires the installation at grade crossings of signaling devices that provide uniform periods of advance notice regardless of train speed. Manual, at 8C–7. Likewise, as discussed *supra*, at 666, automatic gates are required for federally funded projects affecting crossings over which trains travel at high speeds. 23 CFR §§ 646.214(b)(3)(C) and (D). Further support for the view that the limits in § 213.9(a) were set with safety concerns already in mind is found in § 213.9(c). Under that section, railroads may petition for permission from the Rail-

---

[14] See U. S. Dept. of Transportation, Railroad-Highway Safety, Part I: A Comprehensive Statement of the Problem iv (1971) ("Nearly all grade crossing accidents can be said to be attributable to some degree of 'driver error.' Thus, any effective program for improving [crossing] safety should be oriented around the driver and his needs in approaching, traversing, and leaving the crossing site as safely and efficiently as possible"); see also U. S. Department of Transportation, Federal Highway Administration, Rail-Highway Crossings Study 8–1 (1989) ("[T]he most influential predictors of train-vehicle accidents at rail-highway crossings are type of warning devices installed, highway traffic volumes, and train volumes. Less influential, but sometimes significant [is] maximum train speed . . .").

road Administrator to operate in excess of the maximum speed limit of 110 miles per hour, but only upon submission of information pertaining to the signals, grade crossing protections, and other devices that will allow safe operation.

Read against this background, § 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings. Respondent nevertheless maintains that pre-emption is inappropriate because the Secretary's primary purpose in enacting the speed limits was not to ensure safety at grade crossings, but rather to prevent derailments. Section 434 does not, however, call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter of train speed. Respondent also argues that common-law speed restrictions are preserved by the second saving clause of § 434, under which "a State may ... continue in force an additional or more stringent law ... relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard . . . ." The state law on which respondent relies is concerned with local hazards only in the sense that its application turns on the facts of each case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions. Respondent's contrary view would completely deprive the Secretary of the power to pre-empt state common law, a power clearly conferred by § 434. At the least, this renders respondent's reliance on the common law "incompatible with" FRSA and the Secretary's regulations. We thus conclude that respondent's excessive speed claim cannot stand in light of the Secretary's adoption of the regulations in § 213.9.[15]

---

[15] Petitioner is prepared to concede that the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual

## IV

We hold that, under the FRSA, federal regulations adopted by the Secretary of Transportation pre-empt respondent's negligence action only insofar as it asserts that petitioner's train was traveling at an excessive speed. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE THOMAS, with whom JUSTICE SOUTER joins, concurring in part and dissenting in part.

I believe that the Federal Railroad Safety Act and the Secretary of Transportation's implementing regulations pre-empt neither of respondent/cross-petitioner Easterwood's state-law tort claims. I therefore concur in Parts I and II of the Court's opinion but dissent from the remainder.

In Part III of its opinion, the Court holds that the Secretary's regulation setting "maximum allowable operating speeds for all freight and passenger trains" pre-empts Easterwood's claim that CSX "breached its common-law duty to operate its train at a moderate and safe rate of speed" below the federally specified maximum speed at the Cook Street crossing. *Ante,* at 673 (citing 49 CFR § 213.9(a) (1992)). The Court concedes, however, that "the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel *given the nature of the track on which they operate.*" *Ante,* at 674 (emphasis added). Likewise, CSX makes no effort to characterize any duty to reduce speed under Georgia law as a state-law obligation based on track safety, the precise "subject matter" "cover[ed]" by the Secretary's speed regulation. 45 U. S. C. § 434. Indeed, CSX admits that it shoulders a state-law duty to take measures

hazard. Reply Brief for Petitioner in No. 91–790, p. 3. As respondent's complaint alleges only that petitioner's train was traveling too quickly given the "time and place," App. 4, this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

against crossing accidents, including an "attempt to stop or slow the train if possible to avoid a collision."[1]   Reply Brief for Petitioner in No. 91–790, p. 3.   The Court effectively agrees, as is evident from its decision to limit its opinion to a common-law negligence action for excessive speed and from its refusal to address related state-law claims for the violation of a statutory speed limit or the failure to avoid a specific hazard.   See *ante*, at 675, and n. 15.   For me, these concessions dictate the conclusion that Easterwood's excessive speed claim escapes pre-emption.   Speed limits based solely on track characteristics, see 49 CFR §§ 213.51–213.143 (1992), cannot be fairly described as "substantially subsum-[ing] the subject matter of . . . state law" regulating speed as a factor in grade crossing safety.   *Ante*, at 664.

The Secretary's own explanation of his train speed regulation confirms my view that the federal speed standard does not pre-empt state regulation of train speed as a method of ensuring crossing safety.   When the Secretary promulgated his speed regulation in conjunction with a set of track safety standards, he declined to consider "variable factors such as population density near the track" because these matters fell "beyond the scope of the notice of proposed rule making." 36 Fed. Reg. 20336 (1971).   See also *id.*, at 11974 (notice of proposed rulemaking).[2]   By contrast, the state law support-

---

[1] See generally Ga. Code Ann. § 46–8–190(b) (1992) (requiring an "engineer operating [a] locomotive" to "exercise due care in approaching [a] crossing, in order to avoid doing injury to any person or property which may be on the crossing"); *Georgia Railroad & Banking Co.* v. *Cook*, 94 Ga. App. 650, 651–652, 95 S. E. 2d 703, 706–707 (1956); *Atlantic Coast Line R. Co.* v. *Bradshaw*, 34 Ga. App. 360, 129 S. E. 304 (1925).

[2] I reject the Solicitor General's contention that "[t]he Secretary has concluded that reduced train speeds do not represent an appropriate method of preventing crossing accidents."   Brief for United States as *Amicus Curiae* 29.   The very source cited in support of this proposition states that "[i]f a collision [at a crossing] seems unavoidable," a locomotive engineer "must decide whether the train should be slowed or put into emergency mode."   Rail-Highway Crossings Study, Report of the Secretary of Transportation to the United States Congress 5–10

ing Easterwood's excessive speed claim would impose liability on CSX for "operating [a] train at a speed that was greater than reasonable and safe" at a crossing "adjacent to a busily traveled thoroughfare." App. 4–5. Because the Secretary has not even considered how train speed affects crossing safety, much less "adopted a rule, regulation, order, or standard covering [that] subject matter," Georgia remains free to "continue in force any law" regulating train speed for this purpose. 45 U. S. C. § 434.

Only by invoking a broad regulatory "background" can the Court conclude that "§ 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions." *Ante*, at 675. It rests in part on the Manual on Uniform Traffic Control Devices for Streets and Highways, which has no pre-emptive effect by its own terms or under the federal regulations requiring compliance with it. See *ante*, at 668–670; 23 CFR § 646.214(b)(1) (1992) (permitting "State standards" to "supplemen[t]" the Manual). The Court goes so far as to rely on a federal crossing gate regulation that concededly does not govern the Cook Street site. Compare *ante*, at 674 ("[A]utomatic gates are required for federally funded projects"), with *ante*, at 672 ("These facts do not establish that federal funds 'participate[d] in the installation of the [warning] devices' at Cook Street") (quoting 23 CFR § 646.214(b)(3)(i) (1992)). Rather than attempt to excavate such scant evidence of pre-emption, I would follow the most natural reading of the Secretary's regulations: The Federal Government has chosen neither to regulate train speed as a factor affecting grade crossing safety nor to prevent States from doing so. The Court's contrary view of these regulations' pre-emptive effect may well create a jurisdictional gap in which States lack the power to patrol the potentially hazardous operation of trains at speeds below the applicable federal limit.

---

(Apr. 1989). The Secretary's original declaration that he did not consider crossing safety concerns therefore stands uncontradicted.

Had the Secretary wished to pre-empt *all* state laws governing train speed, he could have more explicitly defined the regulatory "subject matter" to be "cover[ed]." Doubtless such a decision would be true to Congress' declared intent that "laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable." 45 U. S. C. § 434. To read the Secretary's existing maximum speed regulation as encompassing safety concerns unrelated to track characteristics, however, negates Congress' desire that state law be accorded "considerable solicitude." *Ante*, at 665. The "historic police powers of the States" to regulate train safety must not "be superseded . . . unless that [is] the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Respect for the presumptive sanctity of state law should be no less when federal pre-emption occurs by administrative fiat rather than by congressional edict. See *Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 153–154 (1982).

I would uphold Easterwood's right to pursue both of the common-law tort claims at issue. Accordingly, I respectfully dissent from the Court's conclusion that the excessive speed claim is pre-empted.