JONATHAN ISBELL, as Adm'r of the Estate of Steven A. Kelso, Deceased, Plaintiff-Appellee, v. UNION PACIFIC RAILROAD COMPANY, Defendant-Appellant (Donald F. Cain *et al.*, Defendants).

Fifth District   No. 5—99—0558

Opinion filed January 25, 2001.

Thomas E. Jones and Leslie G. Offergeld, both of Walker & Williams, P.C., and Dan H. Ball, Kurt E. Reitz, and Ann C. Barron, all of Thompson Coburn L.L.P., both of Belleville, for appellant.

Jon G. Carlson and Eric J. Carlson, both of Carlson & Carlson, P.C., of Edwardsville, for appellee.

JUSTICE HOPKINS delivered the opinion of the court:

Union Pacific Railroad Company (defendant) appeals a jury verdict for Jonathan Isbell (plaintiff) as administrator of the estate of Steven A. Kelso, in plaintiff's cause of action for negligence against defendant. Plaintiff's counts against Donald F. Cain and Missouri Pacific Railroad Company were dismissed at the trial, so defendant and plaintiff are the only parties in this appeal. Plaintiff's cause of action arose out of a fatal collision on December 12, 1995, as Steven drove his employer's truck south on Springfield Road. Steven's truck was struck by defendant's eastbound train at the Springfield Road crossing, which also is owned by defendant. The jury found that defendant was negligent and awarded plaintiff $2.5 million in damages; however, the jury reduced the award by 50% because of Steven's negligence. Defendant appeals.

On appeal, defendant contends that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict (a) because plaintiff's claim that there were inadequate warning signs at the crossing was preempted by federal law and (b) because plaintiff failed to prove that defendant's negligence was the proximate cause of Steven's death. In addition, defendant contends that the trial court erred in numerous evidentiary rulings, that the trial court failed to take judicial notice of statutes regulating crossings, that reversible errors occurred during closing arguments, that the court erred in allowing and refusing certain jury instructions, that the cumulative effect of the trial errors deprived defendant of a fair trial, and that the jury's verdict was excessive. We affirm for the reasons set forth below.

## FACTS

The following evidence pertinent to the issues was adduced at the trial: Thomas Allen, a contractor, testified that his business and his residence are located at the corner of Springfield Road and Miller

Road, about one-half mile north of the Springfield Road crossing. On December 12, 1995, Steven delivered automotive parts to Allen's place of business.

Allen stated that he is very familiar with the Springfield Road crossing as he has lived and worked in the area since 1964. Allen described the crossing as deceiving, and he explained: "[I am] not quite sure what it is about [the crossing], but it seems like you're on the crossing [before you know it]. There is quite a grade change there. And if you're going from north to south, you can see the train cars off in the distance to your right. But I think you tend to lose focus of where the engine is."

Allen also testified that one of his employees had an accident in 1988 at the Springfield Road crossing, while the employee was driving one of Allen's trucks. After the accident, Allen told his employees not to go over the Springfield Road crossing. Allen stated that when crops are growing, the crops visually obstruct the crossing. Allen also stated that it is more difficult to see a train when traveling north on Springfield Road than when driving south, because there are some buildings, trees, a residence, and shrubbery on the right side of the road, south of the crossing, that obstruct the view. Allen knew of two other prior accidents involving a train and motor vehicle at the Springfield Road crossing. On cross-examination, Allen admitted that he did not witness the two other accidents.

Sergeant Michael Strong of the Madison County sheriff's office testified that he was dispatched to Steven's accident on December 12, 1995, about 2:11 that afternoon. Officer Strong inspected the area to determine the cause of the accident. Officer Strong noted that the railroad tracks are about eight feet lower than the road as you approach the crossing. Officer Strong found nothing that would totally obstruct Steven's view of the train, but he stated that there were a few tall weeds in the farmer's field to the west of the crossing. Officer Strong also thought that the sun "possibly" affected Steven's view, as the sun was low in the sky and fairly bright. Officer Strong did not know why Steven did not stop for the train. Officer Strong found skid marks north of the crossing that could have been made by Steven's pickup truck.

Ronald Stubblefield, a locomotive engineer for the Burlington Northern Railroad in 1994, testified that he occasionally used defendant's Springfield Road crossing. Stubblefield explained that when he uses defendant's railroad tracks, he notifies defendant's dispatcher so that defendant knows that he is on its tracks. In June 1994, Stubblefield was involved in a collision with a pickup truck at the Springfield Road crossing. Stubblefield reported the accident to defendant.

Carl Smith, an employee of Norfolk Western for approximately 27 years, testified that a speed tape from a locomotive is equivalent to a black box on an airplane because it is an event recorder that gives data that occurred during a given period. Smith stated that from 1979 until he retired in 1995, he reviewed speed tapes about once a week. Smith explained that speed tapes are used to determine if an engineer contributed to an accident or if the engineer performed his duties properly.

Smith reviewed the speed tape from defendant's train that collided with Steven's truck. He determined that in the 16 seconds immediately before the collision, the locomotive traveled at 62 miles per hour for eight seconds and 61 miles per hour for another eight seconds. Smith stated that the train was placed in full emergency when it was traveling 62 miles per hour. Smith also explained that a train's speed can be converted into feet per second. According to Smith, if the train had been going 60 miles per hour, the maximum speed allowed for a train on these tracks, for the 16 seconds that the train was going more than 60 miles per hour, there would have been a 35.12-foot difference.

On cross-examination, Smith admitted that it takes a long time for a train to slow down, because of the length of a train. Smith also admitted that the train traveled at 58 miles per hour for four seconds shortly before the collision.

Donald Cain, the engineer who operated defendant's train on December 12, 1995, testified that he did not see Steven's truck prior to the collision. Cain became aware of a problem when Charles Cudworth put the train in emergency. Cain was sitting in the front seat on the right side of the locomotive, the opposite side from Steven's path of travel, and Cudworth was sitting in the front seat on the left side of the locomotive. Although there are windows on each side and in the front of the locomotive, Cain could not see to the left as Cudworth blocked his view.

Cain explained that an engineer of a train operates the throttle, brake, and whistle of the locomotive. On December 12, 1995, Cudworth was learning the route, and Cain was showing Cudworth the terrain and informing him where the signal locations were.

Cain stated that he would not have done anything differently even if he had known the prior accident history of the Springfield Road crossing. Cain also stated that he has more than 80 crossings in his territory and that he does not know what has happened at any of the crossings.

Cain testified that he was watching the speedometer on December 12, 1995, and he did not see the speedometer exceed 60 miles per hour. Cain stated that the grade of the track at this crossing is downhill. In

addition to watching the speedometer, Cain was sounding the whistle and watching two crossings, Smith Road and Springfield Road, which are less than a quarter of a mile apart, to make sure there was no oncoming traffic and that the crossings were clear. Cain explained that as a train approaches a crossing, the view is more limited and restricted.

Cain saw hunters along the tracks near the crossing on December 12, 1995. Cain blew the train whistle to warn the hunters of the train's approach.

Bobby Williams, the conductor on defendant's train on December 12, 1995, testified that he did not see Steven's truck before the collision as he was watching for the next signal to see if the train was cleared to proceed. Williams sat behind Cudworth on the left side of the locomotive. Williams had to lean to the right to see around Cudworth and out of the front of the train. Williams saw Steven's truck after Cudworth grabbed the emergency brake. According to Williams, the train stopped about a half to three-quarters of a mile past the crossing.

Williams did not personally believe that 2 miles per hour over the 60-mile-per-hour speed limit would have made a difference in this accident because even at 60 miles per hour it would have taken a long time to stop the train. Williams also did not think that it was important for him to know the accident history of a crossing, as he has the same duties to perform at every crossing.

Cudworth testified that he has been a locomotive engineer since 1968. Cudworth saw Steven's truck when Steven was about 400 feet from the crossing. It appeared to Cudworth that Steven was braking, but then Steven "gunned" his truck and pulled in front of the train. At that time, Cudworth reached for the emergency brake. When Cudworth saw Steven initially brake, he presumed that Steven was going to stop. Cudworth stated that all he can do to avoid an accident is place a train in emergency.

Cudworth acknowledged that trains have speed restrictions. Cudworth also stated that he treats all crossings as dangerous. Cudworth explained that the grade of the land, the weight on the train, and the locomotive's power affect a train's stopping time. Cudworth stated that, even at 60 miles per hour, it takes a normal train about a mile to stop.

John Leick, senior claims specialist for defendant, investigated Steven's accident. Leick stated that approximately 278 of defendant's trains and 106 Burlington Northern trains used the Springfield Road crossing during the 30 days prior to Steven's accident.

Stanley McLaughlin, vice president of defendant's quality and pro-

cess improvements, testified through an evidence deposition. McLaughlin's testimony established that defendant has no independent program for inspecting and evaluating crossings to determine if the warning devices at a crossing are adequate, if additional warning devices are needed, or what type of warning device should be installed.

Dr. John Baerwald, a traffic engineer, testified as an expert witness concerning whether crossings are extrahazardous and whether warning devices at a crossing are adequate. Dr. Baerwald stated that there are two types of warning devices available for crossings, passive and active. Dr. Baerwald described passive warnings as crossbucks—circular, yellow signs with an "X" and "RR" on it—and stop signs. Dr. Baerwald stated that passive warnings do not advise a motorist if a train is coming or is on the crossing but only tell the motorist that there are train tracks ahead. In contrast, active warnings notify a motorist if a train is coming or is on the crossing. Active warnings are flashing lights or flashing lights accompanied by short-arm gates. Dr. Baerwald stated that active warnings give a driver "positive guidance." Dr. Baerwald testified that a 1989 report indicated that if flashing lights are placed at railroad crossings, accidents are reduced by 77% and that when both flashing lights and gates are installed at a crossing, accidents are reduced by 86%. Dr. Baerwald explained that a train whistle is a supplementary warning that depends upon a driver's ability to hear it and to discern from what direction a train is coming.

Dr. Baerwald stated that in evaluating a crossing the visual obstructions in all four quadrants of a crossing must be considered, and ideally, a driver should have a straight, unobstructed approach well in advance of a crossing. Sharp turns, angles, or curves present a problem. Also, a driver should be able to see a sufficient distance down a railroad track so that at a certain decision point a driver can decide if a train is coming. Dr. Baerwald explained that state and federal tables have been developed to determine how far a motorist should be able to see so he can decide whether he should stop at a crossing. In the case *sub judice*, where the motorist has a maximum speed of 55 miles per hour and the train has a maximum speed of 60 miles per hour, a driver should be able to see 700 feet down the railroad tracks when he is 565 feet from the outer rail of the crossing.

Dr. Baerwald formed his opinion regarding the Springfield Road crossing after he reviewed depositions, statements, the accident report of this accident, accident reports of previous accidents, communications from government bodies, the traffic-count information provided by the county, and the train traffic information provided by the railroad. Dr. Baerwald also made three visits to the accident scene. In Dr. Baerwald's opinion, the Springfield Road crossing is extrahazard-

ous. According to Dr. Baerwald, any crossing where a train and a motor vehicle can be at a crossing at the same time is a hazard. The hazard increases as the number of vehicles and trains using the crossing increases. At the Springfield Road crossing, approximately 400 vehicles per day and 8 to 18 trains per day used the crossing. Both the trains (60 miles per hour) and the vehicles (55 miles per hour) travel at high speeds at the crossing. Additionally, the angle of the train tracks to the road is 61 degrees rather than the desired angle of 90 degrees, which contributes to the hazard. The train tracks are at a lower elevation than the surrounding land, allowing a motorist to see only part of the train at 565 feet from the crossing.

The Springfield Road crossing contains view obstructions in all four quadrants: in the southeast quadrant there are residential and other buildings and trees; in the northeast quadrant there is a line of trees that are 31 feet high approximately 600 feet from the tracks; and in all quadrants there are crops, a seasonal obstruction. Dr. Baerwald explained that a motorist must be concerned with at least two quadrants, the right and the left, because until the train is seen, a motorist does not know from which direction the train is coming even if the driver hears the train's whistle. Another factor Dr. Baerwald considered was that the placement of the crossbucks on the north side of the tracks was 39 feet from the rail. Federal regulations require crossbucks to be 12 to 15 feet from the rail, while state regulations require crossbucks to be 8½ to 15 feet from the rail. Because the crossbucks were farther from the Springfield Road crossing than allowed by law, Dr. Baerwald believed that this confused Steven as he would expect the rail to be shortly after the crossbucks and would induce Steven to think that the tracks were closer than they actually were.

Dr. Baerwald stated that the accident history of the Springfield Road crossing contributes to his determination that the crossing is extrahazardous and that a motorist cannot make a reasonable and accurate evaluation as to whether it is safe to proceed across the crossing. Dr. Baerwald further stated that the passive warnings were inadequate for the extrahazardous crossing and that positive guidance was needed. Dr. Baerwald was of the opinion that the Springfield Road crossing should have, at a minimum, flashing lights and, preferably, flashing lights and gates. In the interim, until active warnings are installed, the crossing should have a stop sign or a flagman. According to Dr. Baerwald, a railroad can obtain permission from the various government bodies to install active warnings. It was Dr. Baerwald's opinion that the extrahazardous nature of the crossing and the inadequate warnings at the crossing contributed to Steven's accident.

On cross-examination, Dr. Baerwald explained that even though the 61-degree angle of the train placed the train more within Steven's field of vision, because the train is in a head-on position, it is harder for a motorist to estimate the speed of a train.

Steven's parents, Evelyn and Robert Kelso, testified as to their relationship with Steven. Neither of them depended upon Steven for financial support. Evelyn saw Steven about three times a month. Steven helped Evelyn cut her grass and fix her car, and he performed other activities around the house that she could not do herself. Evelyn and Steven went out to dinner and shopping. Steven worked at McKay's Auto Body, and he had plans to marry Holly Bergman. Evelyn testified that she missed her son's society and companionship very much.

Robert and Steven worked on cars, went swimming, and rode motorcycles together. Steven lived with Robert at the time of Steven's death. Robert also testified as to Steven's careful habits when driving over railroad tracks. According to Robert, when Steven came to railroad tracks, he would slow down and look in both directions.

Holly Bergman corroborated that she and Steven were engaged to be married and that Steven was careful when he drove over railroad tracks.

Plaintiff introduced into evidence, over defendant's objection, four newspaper articles regarding other accidents between trains and motor vehicles at the Springfield Road crossing. One article was from the June 23, 1994, edition of the Alton Telegraph. The other three articles were from the Edwardsville Intelligencer—one from August 16, 1971, one from September 6, 1988, and one from June 23, 1994.

Following this evidence, the jury found defendant to be negligent and awarded plaintiff $2.5 million in damages. As noted previously, the jury also determined that Steven was 50% contributorily negligent and reduced plaintiff's damages accordingly. Defendant appeals.

## ANALYSIS

Defendant contends that it was entitled to a judgment notwithstanding the verdict because the Federal Highway Safety Act of 1973 (FHSA) (23 U.S.C. § 101 *et seq.* (1994)) provides that when federal funds are used in an improvement project, a plaintiff's state-law claim that a crossing has inadequate warnings is preempted under the Federal Railroad Safety Act of 1970 (FRSA) (49 U.S.C. § 20106 (1994)). Defendant claims that the Springfield Road crossing was designated to be improved with flashing lights and gates in March 1995 and that there was an agreement for preliminary engineering for the improvements between it and the Illinois Department of Transportation

(IDOT). Defendant asserts that because federal funds were used to pay for the preliminary engineering work for the crossing improvements, plaintiff's claim that it failed to provide adequate warning signs at the crossing is preempted under federal law. Specifically, defendant contends that sections 646.214(b)(3) and (b)(4) of Title 23 of the Code of Federal Regulations (23 C.F.R. §§ 646.214(b)(3), (b)(4) (1996)) cover the subject of inadequate warning devices and that, therefore, plaintiff's claim is preempted. Because this is a matter of law, we review the issue *de novo*. *Hubeny v. Chairse*, 305 Ill. App. 3d 1038 (1999).

Here, the record reveals that in March 1995, before Steven's accident, a "letter of understanding" was sent by the IDOT to defendant. The letter recited that some projects involving defendant's railroad, including an upgrade of the Springfield Road crossing with flashing lights and gates, had been selected for upgrades in the coming fiscal year. The letter further provided that the railroad could begin preliminary engineering on the projects and that the cost of the preliminary engineering work would be borne by the state "subject to the reimbursement by the Federal Highway Administration." The March 1995 letter of understanding was to be executed by defendant, but the letter admitted into evidence at the trial was unsigned. There was nothing properly admitted into the record to reflect when defendant executed the agreement and nothing to show when or if defendant was paid federal funds for the preliminary engineering report for the Springfield Road crossing. Another document in the record reflects that, as of November 19, 1997, almost two years after Steven's accident, construction had not yet commenced on the upgrade of the Springfield Road crossing.

The FRSA was adopted in 1970 "to promote safety in every area of railroad operations and to reduce railroad-related accidents." 49 U.S.C. § 20101 (1994). Under the FRSA, the Secretary of Transportation is given broad powers to prescribe rules and regulations with respect to railroad safety. 49 U.S.C. § 20103 (1994). Once the Secretary prescribes a regulation covering a subject matter, a state's regulation of that area is preempted unless the state's regulation is necessary to eliminate or reduce a local safety hazard, is compatible with federal law, and does not unreasonably burden interstate commerce. 49 U.S.C. § 20106 (1994). Pursuant to the federal law, sections 646.214(b)(3) and (b)(4) were promulgated by the Federal Department of Transportation and provide as follows:

"(b) Grade crossing improvements. ***
***
(3)(i) *Adequate warning devices*, under § 646.214(b)(2) or on any

project where Federal-aid funds participate in the installation of the devices[,] are to include automatic gates with flashing light signals when one or more of the following conditions exist:

\* \* \*

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of [the Federal Highway Administration]." 23 C.F.R. §§ 646.214(b)(3), (b)(4) (2000).

■ The issue raised in this case by defendant was addressed by the United States Supreme Court in *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 123 L. Ed. 2d 387, 113 S. Ct. 1732 (1993). In *Easterwood,* the Supreme Court determined that, when applicable, federal preemption applies under sections 646.214(b)(3) and (b)(4) to a plaintiff's cause of action for state law negligence when federal-aid funds participate in the installation of warning devices, as these regulations cover the subject of the adequacy of warning devices. *Easterwood,* 507 U.S. at 670, 123 L. Ed. 2d at 400, 113 S. Ct. at 1740-41. For federal preemption to be applicable, the condition of the regulations must be met. *Easterwood,* 507 U.S. at 671, 123 L. Ed. 2d at 401, 113 S. Ct. at 1741. The Supreme Court is reluctant to interpret a federal statute pertaining to a subject traditionally governed by state law as preempting state law, and preemption will not lie unless it is the clear and manifest purpose of Congress. *Easterwood,* 507 U.S. at 664, 123 L. Ed. 2d at 396, 113 S. Ct. at 1737.

The Supreme Court in *Easterwood* held that the condition of the regulations, *i.e.,* that federal funds participate in the improvement at the crossing, was not met because the installment of motion-detection circuitry did not meet the regulations' definition of warning devices, because the federal funds earmarked for the installation of gate arms at the crossing were transferred to another project, and because the installation of the gate arms at that particular crossing was placed on a list of projects to be considered at a later time. *Easterwood,* 507 U.S. at 672-73, 123 L. Ed. 2d at 402, 113 S. Ct. at 1742. Therefore, the Supreme Court in *Easterwood* held that the plaintiff's state negligence action was not preempted by federal law. *Easterwood,* 507 U.S. at 673, 123 L. Ed. 2d at 402, 113 S. Ct. at 1742.

At least three subsequent federal cases have applied *Easterwood.* In *Hatfield v. Burlington Northern R.R. Co.,* 64 F.3d 559 (10th Cir. 1995), the United States Court of Appeals, Tenth Circuit, determined that under federal law the commitment of federal resources for, and the completion of, a preliminary engineering report on a federally

reimbursable project constitutes significant federal participation sufficient to preempt a plaintiff's cause of action for negligence based upon a claim of inadequate warning devices.

In contrast, in *St. Louis Southwestern Ry. Co. v. Malone Freight Lines, Inc.*, 39 F.3d 864 (8th Cir. 1994), the United States Court of Appeals, Eighth Circuit, held that a preemption of a state claim of negligence does not occur until a federally approved upgrade is installed and operating, rather than when the plan is approved and subject to reimbursement by federal funds. *St. Louis Southwestern Ry. Co.*, 39 F.3d at 867. In *St. Louis Southwestern Ry. Co.*, the state and the Federal Highway Administration approved a preliminary engineering report and plan by the railway, and the state agency issued a work order authorizing the railway to proceed with installation. Actual construction of the project began, but was not completed, four days before the plaintiff's accident at the crossing. *St. Louis Southwestern Ry. Co.*, 39 F.3d at 866. The court of appeals explained its reasoning in *St. Louis Southwestern Ry. Co.* as follows:

> "Before preemption, the public is protected by a railroad's State common-law duty of care. After installation of Federally mandated warning devices, the public is protected by those devices. A plan to install devices and Federal approval of a plan do not protect the public, however. The Railway's interpretation that Federal approval triggers preemption would leave the public unprotected between the time of approval and the time the prescribed devices are installed and operating. This can be a substantial period of time. In this case, it was fifteen months. To encourage prompt installation of Federally prescribed warning devices, a railroad's common-law duty of care must continue until those devices are installed." *St. Louis Southwestern Ry. Co.*, 39 F.3d at 867.

Similarly, in *Thiele v. Norfolk & Western Ry. Co.*, 68 F.3d 179, 183 (7th Cir. 1995), the United States Court of Appeals, Seventh Circuit, held that when section 646.214(b)(3) or (b)(4) applies to a crossing upgrade, there is no preemption of state-law adequacy-of-warning devices claims until the devices are installed and fully operational. The court of appeals in *Thiele* stated:

> "The conclusion of *Easterwood* supports our conclusion. \*\*\*
>
> Our conclusion also conforms to common sense because otherwise the public would be unprotected by either state or federal law for the period between federal approval and actual warning device installation. \*\*\*
>
> Moreover, adopting the rule [Norfolk & Western] proposes would mean that for projects where the federal government approved warning devices or prescribed them for a particular crossing, but for some reason the project was never completed \*\*\*, the public

would be unprotected indefinitely, even though nothing had actually changed at the crossing. That would hardly fit with the FRSA's goal of increasing safety at railroad crossings." *Thiele*, 68 F.3d at 184.

■ In the case *sub judice*, defendant's argument is identical to the issue decided in the foregoing cases, and defendant, too, urges this court to determine that a state claim for inadequate warning devices is preempted by federal law when plans for an upgrade of a crossing have been approved and the expenses reimbursed even though the construction of the upgrade has not commenced. We decline to do so and find that plaintiff's claim that there were inadequate warning devices at the crossing is not preempted by federal law.

In declining to find that plaintiff's negligence claims are preempted by federal law, we find the reasoning of *St. Louis Southwestern Ry. Co.* and *Thiele* persuasive. We, too, believe that to hold that plaintiff's negligence claim was federally preempted would wreak a great injustice. If we hold that federal preemption occurred when defendant was given approval for and had been paid federal funds for the preliminary engineering report on the upgrade at the crossing, then any person injured or killed at the Springfield Road crossing would have no legal recourse until such time as the upgrade of the crossing was completed. This court does not know if that crossing is as yet upgraded, five years later. As stated in *St. Louis Southwestern Ry. Co.*, the imposition of common law liability on the railroad until such time as an upgrade is completed and operational encourages the railroad to complete the upgrade. *St. Louis Southwestern Ry. Co.*, 39 F.3d at 867.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

GOLDENHERSH and KUEHN, JJ., concur.