Joshua A. NYE, et al.  Plaintiffs

v.

CSX TRANSPORTATION, INC., et al.  Defendants

No. 1:02 CV 1528.

United States District Court, N.D. Ohio, Eastern Division.

Jan. 22, 2004.

James M. Drozdowski, Esq., Pasquale DiMassa, Jr., Esq., Robert J. Fogarty, Esq., Andrew S. Pollis, Esq., Hahn, Loeser & Parks, Cleveland, Robert B. Blackwell, Esq., Blackwell Law Offices, Findlay, for Plaintiffs.

James R. Carnes, Esq., Robert M. Anspach, Esq., Anspach, Meeks & Nunn, L.L.P., Toledo, for Defendants.

*MEMORANDUM OF OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CONSTRUING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AS A MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF PRE-EMPTION AND GRANTING THAT MOTION IN PART AND DENYING IT IN PART*

WELLS, District Judge.

Plaintiff Joshua Nye suffered devastating injuries when the car he was driving in collided with a train owned and operated by defendants. While this case presents a host of issues regarding liability for the accident, the sole issue now before this Court is whether, and to what extent, federal law preempts certain theories of plaintiffs' state tort claims. The parties have presented and argued the pre-emption question in two separate motions which this Court treats as cross-motions for partial summary judgment. While defendants CSX Transportation, Inc., R.L. Helmert, and B.A. Babbitt (collectively referred to as "CSXT") initially framed the pre-emption issue as a motion to dismiss for lack of subject matter jurisdiction (Docket # 56), the substance of their motion is really one for summary judgment on their affirmative defense of pre-emption. Plaintiffs Joshua Nye and Judy Ramirez (collectively referred to as the "Nyes") then filed their own motion for partial summary judgment on CSXT's defense of pre-emption (Docket # 72) and a combined brief in support of their motion for partial summary judgment and in opposition to defendants' motion to dismiss. (Docket # 73). Defendants likewise filed a combined reply brief in support of its motion to dismiss and

opposition brief to plaintiffs' motion for partial summary judgment. (Docket # 76). On 12 January 2004, plaintiffs filed a reply brief in further support of their motion for partial summary judgment on CSXT's defense of pre-emption. (Docket # 84). Defendants then filed a sur-reply. (Docket # 87).

For the reasons set forth below, this Court finds that federal law partially preempts the Nye's state law claims, precluding them from arguing certain theories of negligence based on the inadequacy of the warning devices, but does not preempt their claims based on the insufficiency of lights and/or reflector strips on CSXT's rail cars.

## I. FACTUAL BACKGROUND

An analysis of the pre-emption issues in this case requires an understanding of both the circumstances of Mr. Nye's accident at the Hough Road railroad crossing ("Hough Road crossing") and the context under which the warning devices were installed at that crossing. None of the essential facts are in dispute.

### A. Joshua Nye's Accident at the Hough Road Crossing

In the early morning hours of 2 July 2000, plaintiff Joshua Nye was a passenger in a car driven by Larry L. Bishop, traveling northbound on Hough Road in Wood County, Ohio. At a stop sign located at the intersection of State Route 18 and Hough Road, just south of the Hough Road crossing, Mr. Bishop attempted to apply his brakes; however, his brakes failed causing him to proceed through the intersection toward the railroad tracks. (Bishop Dep. at 22–23). When Mr. Bishop finally noticed a train on the tracks, he attempted to avoid it by swerving the car out of the way. (Bishop Dep. at 25, 80, and 84–85; Docket # 73, Ex. 6). Ultimately, Bishop's car, with Nye as a passenger, collided with the side of a train, owned and operated by

CSXT. (Aughenbaugh Dep. at 31). Nye sustained severe injuries as a result of the collision, resulting in the amputation of both legs. (Docket # 73, Ex. 7).

The Nyes sued CSXT raising claims of negligence, loss of consortium, and punitive damages. (Docket # 1, Attachment # 1). In their complaint, the Nyes alleged that one proximate cause of the collision were negligent acts and/or omissions on CSXT's part which included, among other things:

(1) Inadequate warnings visible to Bishop as he approached the Hough Road crossing;

(2) Insufficient lights and/or reflector strips;

(3) CSXT's failure to perform a diagnostic review or safety study of the Hough Road crossing prior to the accident;

(4) Crossbuck sign at the Hough Road crossing was defectively designed, maintained, and insufficiently visible to Bishop as he approached the crossing;

(5) Inadequate pavement markings at the Hough Road crossing;

(6) CSXT failed to sound an adequate and audible warning as the train approached;

(7) CSXT failed to avoid the hazards presented by the crossing and to operate the train within applicable speed restrictions;

(8) Hough Road crossing was defectively designed, constructed, and maintained by CSXT; and,

(9) CSXT negligently operated the train as it approached and passed through the Hough Road crossing.

(Docket # 1, Attachment # 1, at ¶¶ 11(i)-(ix)). In their answer, CSXT asserted, as an affirmative defense, that plaintiffs' claims were

preempted, in whole or in part, by federal and/or state law, including but not

limited to, the Federal Rail Safety Act, 45 U.S.C. § 421, et seq., and Federal Rail Safety Act, 23 U.S.C. §§ 4010–4404. (Docket #5, at ¶27). It is CSXT's preemption defense which is the subject of the present motions.

## B. CSXT's Installation of Warning Devices at the Hough Road Crossing

In 1993, the Ohio Department of Transportation ("ODOT") submitted a proposal to the U.S. Department of Transportation, Federal Highway Administration ("FHWA") to study the effectiveness of a "new, experimental 'Buckeye' crossbuck in reducing accidents at public, passive grade crossings in Ohio." (Kirkland Aff., Exhibit A, at 2). Based on this proposal, ODOT developed the Ohio Buckeye Crossbuck Program ("Buckeye Crossbuck Program"), a federally funded program intended to evaluate new crossbuck designs and to improve grade crossings. (Kirkland Aff., at ¶¶ 2 and 5). Funded 100% by the federal government, the Buckeye Crossbuck Program involved the installation of either an upgraded Standard Crossbuck or an experimental Buckeye Crossbuck. (Kirkland Aff. at ¶ 6).[1]

On 9 April 1993, CSXT and the State of Ohio entered into an agreement to cooperate in a demonstration project to evaluate the relative safety improvements generated by the new Buckeye Crossbuck versus an upgraded Standard Crossbuck. (Kirkland Aff., at ¶ 7, Ex. E).[2] Under the agreement, CSXT was "to provide all labor, equipment, tools and materials" to install the crossbucks at all passively guarded CSXT grade crossings in the State of Ohio, but would be fully reimbursed by the state for these installation of the crossbucks. (Kirkland Aff., at ¶ 7, Ex. E). The State of Ohio received the funding by which it reimbursed CSXT pursuant to the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"). (Kirkland Aff. II, at ¶ 4). Following the installation of the crossbucks under the agreement, CSXT became the owner of the crossbucks and was required to "maintain them in good condition, as required by statute at company cost and expense." (Kirkland Aff., Ex. E).

As a part of the federally funded Buckeye Crossbuck Program, CSXT installed two upgraded Standard Crossbucks at the Hough Road crossing on 10 November 1995. (Kirkland Aff., at ¶ 10, Ex. F).[3] While these crossbucks were installed pursuant to approval granted by the FHWA, the FHWA itself made no determination that a standard crossbuck at the Hough Road crossing would be adequate. (Kirkland Aff., at ¶ 12; Kirkland Aff. II, at ¶ 2). In fact, the first determination of the adequacy of warning devices at the Hough Road crossing was not made until 2000

---

1. Under the Buckeye Crossbuck Program, Buckeye Crossbucks were placed at passive crossings bearing even numbered DOT identification numbers while upgraded Standard Crossbuck signs were installed at passive crossings with odd numbered DOT identification numbers. (Kirkland Aff. at ¶ 6). Standard Crossbucks are black-and-white X-shaped signs that read "RAILROAD CROSSING." (Kirkland Aff., Exhibit A, at 4). The upgraded Standard Crossbucks were reflectorized. (Kirkland Aff., Ex. E, at 1). The Buckeye Crossbuck is a Standard Crossbuck with red lettering, reflective tape on the blades, reflective sheeting on all four sides of the post, and a new sign mounted on the crossbuck's post which read "YIELD" in red lettering and a white background. (Kirkland Aff., Exhibit A, at 4).

2. The project was assigned State Project Number 13289 and Federal–Aid Project Number RRSG–000S(134).

3. Ultimately the FHWA paid $271,756.85 for the installation of Standard Crossbucks and Buckeye Crossbucks at CSXT's crossings in the State of Ohio pursuant to the Buckeye Crossbuck Program, representing 100% of the total installation cost. (Cores Aff., at ¶ 4).

when the State of Ohio, through a diagnostic team comprised of individuals from the Ohio Rail Development Commission, CSXT, the Public Utilities Commission, and local highway authorities, recommended that the crossing either be closed or flashing lights and roadway gates be installed. (Kirkland Aff. II, at ¶ 2).

## II. *STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is appropriate if the evidence in the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, where the nonmoving party has the burden of proof in a case, the moving party can satisfy its initial burden "by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

If the motion is properly made and supported as provided in Rule 56(c), the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts' showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. It is not enough for the nonmoving party to point to any alleged factual dispute between the parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) To survive summary judgment, the dispute must involve a genuine issue of material fact; that is, a fact that might affect the outcome of the suit under the governing substantive law. *Anderson*, 477

U.S. at 248, 106 S.Ct. 2505 (noting that the "mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")

Summary judgment is intended as a mechanism for isolating and disposing of "factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. To that end, the inquiry on summary judgment mirrors the directed verdict standard, and summary judgment should be entered when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (quoting *Matsushita Elec. Industrial Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). If the nonmoving party bears the burden of proof at trial and fails to present "a jury question as to each element of its case", the motion for summary judgment must be granted. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). Given the focus of summary judgment on evaluating what a reasonable jury could find, courts may not consider hearsay evidence in reaching their conclusions. *Hartsel v. Keys*, 87 F.3d at 799. In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

Here there are no facts in dispute that would prevent the resolution of the legal issues involving preemption.

## III. *LAW AND ANALYSIS*

In its motion, CSXT argues that plaintiffs' claims regarding the adequacy of the warning devices at the Hough Road crossing on 2 July 2000 and involving the reflectivity of the CSXT train are pre-

empted by federal law. Federal pre-emption of state law arises when "a state statute conflicts with, or frustrates, federal law." *CSX v. Easterwood*, 507 U.S. 658, 663, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (*citing* U.S. Const., Art. VI, cl. 2 and *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). Pre-emption may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). To avoid the unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. *Easterwood*, 507 U.S. at 663, 113 S.Ct. 1732. Thus, pre-emption will not occur unless it is "the clear and manifest purpose of Congress." *Id.* (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447, (1947)). Pre-emption may result not only from actions taken by Congress itself, but also from those taken by federal agencies acting within the scope of their congressionally delegated authority. *Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 369, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). The ultimate question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law. *Id.*

## A. Adequacy of the Warning Devices at the Hough Road Crossing

CSXT contends that plaintiffs' tort claims are pre-empted by the Federal Rail Safety Act of 1970 ("FRSA") in conjunction with 23 C.F.R. §§ 646.214(b)(3) and (4) to the extent that they are based on arguments that "some other type of warning device should have been present at the Hough Road crossing, or that the Standard Crossbucks present at the Hough Road crossing were inadequate."

In 1970, Congress enacted the Federal Railroad Safety Act (FRSA) "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To achieve these goals, FRSA granted the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety," 49 U.S.C. § 20103(a), and directs the Secretary to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem," 49 U.S.C. § 20134(a). FRSA also contains an express pre-emption and savings clause, which states, in pertinent part:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106.

In 1973, Congress enacted the Highway Safety Act which, among other things created the Federal Railway–Highway Crossings Program (Crossings Program), making funds available to States for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a). The Secretary, through the FHWA, has promulgated several regulations implementing the Crossings Program. Of particular relevance to this case, 23 C.F.R. §§ 646.214(b)(3) and (4) "address the adequacy of warning devices installed under the program." *Norfolk Southern Railway Company v. Shanklin*, 529 U.S. 344, 348, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). Under Section 646.214(b)(3)(i), "[a]dequate warning devices ... on any project where Federal-

aid funds participate in the installation of the devices are to include automatic gates with flashing lights" if any of several conditions are present.[4] Where 646.214(b)(3) does not apply, subsection (b)(4) provides that the "the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of the FHWA."

In *Easterwood,* the United States Supreme Court held that those regulations "establish the requirements as to the installation of particular warning devices" and "displace state and private decision-making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval be obtained." 507 U.S. at 670, 113 S.Ct. 1732. As a result, when applicable, these regulations preempt state tort law. *Id.*

The United States Supreme Court, in *Shanklin,* took up the question of when Sections §§ 646.214(b)(3) and (4) apply. The Court held that "once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating," the regulations establish a federal standard for the adequacy of those devices and displace "state tort law addressing the same subject." *Shanklin,* 529 U.S. at 354 and 357, 120 S.Ct. 1467. The applicability of these regulations do not depend on "any individualized determination of adequacy by a diagnostic team or an FHWA official." *Id.* at 355, 120 S.Ct.

1467. Moreover, it is inconsequential whether the State or FHWA actually adhered to the standards set out Sections 646.214(b)(3) and (b)(4). *Id.* at 357, 120 S.Ct. 1467. In terms of pre-emption, it is immaterial

> [w]hether the State should have originally installed different or additional devices, or whether conditions at the crossing have changed such that automatic gates and flashing lights would be appropriate.

*Id.* at 357–58, 120 S.Ct. 1467. With *Easterwood* and *Shanklin,* the Supreme Court has made clear that Sections 646.214(b)(3) and (b)(4) "pre-empt state tort claims concerning the adequacy of all warning devices installed with the participation of federal funds." *Id.* at 357, 120 S.Ct. 1467.

In the present case, it is undisputed that the FHWA approved the Buckeye Crossbuck Program and that federal funding was used to install the Standard Crossbucks at the Hough Road crossing. Still, the Nyes argue that its tort claims based on the adequacy of the warning devices at the Hough Road crossing are not preempted because the regulations are inapplicable to Buckeye Crossbucks Program. Specifically, the Nyes contend that the regulations are inapplicable because Ohio made no determination of the adequacy of the warning devices installed under the Buckeye Crossbucks Program, because the program was funded pursuant to the ISTEA and not the Crossings Program, and

---

4. These conditions include:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

23 C.F.R. § 646.214(b)(i).

because the program was an experimental project and not an improvement project. However, given the breadth of the *Shanklin* holding and related regulations, Sections 646.214(b)(3) and (b)(4) are applicable to the warning devices in this case.

To begin with, ODOT's failure to make an adequacy determination regarding the warning devices and the source of federal funding for the Buckeye Crossbuck Program are both irrelevant. It is true that the Buckeye Crossbuck Program evolved in a slightly different factual context than the one at issue in *Shanklin*. In *Shanklin*, the Tennessee Department of Transportation installed crossbucks with federal funds received under the Crossings Program and its request for funding included detailed information about each crossing covered by the project, including the presence or absence of several of the factors listed in Section 646.214(b)(3). 529 U.S. at 350, 120 S.Ct. 1467. The Buckeye Crossbucks Program, on the other hand, received funding under the Intermodal Surface Transportation Efficiency Act ("ISTEA") and, in requesting funding from FHWA, ODOT did not consider any of the conditions listed in Section 646.214(b)(3). (Kirkland Aff., at ¶¶ 3–4).

Despite these factual differences, FHWA's approval and ultimate funding of the Ohio Crossbucks Program triggered pre-emption with respect to warning devices, as in *Shanklin*. Further examination of FHWA's regulations demonstrates the irrelevance of the precise source of the federal funding to the question of pre-emption. Sections 646.214(b)(3) and (b)(4) were enacted by the FHWA as a part of its effort "to prescribe policies and procedures for advancing Federal-aid projects involving railroad facilities" and apply to all Federal-aid projects involving railroad facilities. 23 C.F.R. 646.200(a) and (b). Federal funding for these projects may be procured "through the Federal-aid funding source appropriate for the involved project." 23 C.F.R. 646.208. Accordingly, with respect to the preemptive effect of Sections 646.214(b)(3) and (b)(4), it is immaterial whether the Federal-aid project is funded pursuant to the Crossings Program or the ISTEA.

Likewise, ODOT's failure to make an adequacy determination regarding the warning devices to be installed under the Buckeye Crossbucks program does not render Sections 646.214(b)(3) and (b)(4) inapplicable. As explained in *Shanklin*, once the project has been approved and funded by the FHWA, Sections 646.214(b)(3) and (b)(4) establish a federal standard for adequacy of those devices displacing state tort law on that subject. Accordingly, as long as the warning devices approved by the FHWA were properly installed, operating, and maintained, CSXT cannot be held liable under state law based on a negligence theory that the devices themselves were inadequate. *Shanklin*, 529 U.S. at 358–59, 120 S.Ct. 1467. State or federal compliance with the requirements of 646.214(b)(3) is of no consequence to the pre-emption question and no individualized determination of adequacy is required. *Id.* at 356–58, 120 S.Ct. 1467. The Nyes admit that actual compliance with the requirements of 646.214(b)(3) and the Manual of Uniform Traffic Control Devices has no effect on pre-emption. However, they argue that "[o]nly if the state purports to determine what signage would constitute 'adequate' or 'appropriate' protection does the FHWA approval ... displace state law." (Docket # 84, at 4). In other words, according to the Nyes, Ohio need not make a correct determination regarding adequacy but it must at least make some determination for state tort law to be pre-empted. The Nyes thus opine that the regulations were applicable in *Shanklin* only because the Tennessee Department of Transportation had determined that warning devices

other than automatic gates and flashing lights were appropriate. *Shanklin* does stand for such a proposition. On the contrary, in *Shanklin*, the Supreme Court concluded that when federal funds are involved in the installation of warning devices, either 646.214(b)(3) or 646.214(b)(4) will apply. *Shanklin*, 529 U.S. at 354, 120 S.Ct. 1467. The Court's reference to the Tennessee DOT's determination that other devices were appropriate was merely to explain that Section 646.214(b)(4) (and not 646.241(b)(3)) applied and therefore the Tennessee DOT's decision was subject to the approval of the FHWA. *Id.* at 358–59, 120 S.Ct. 1467. By receiving federal funding, Ohio's decision to use certain crossbucks was subject to FHWA approval which thereby pre-empted state tort law, regardless of whether the decision was accompanied by an individualized determination of the adequacy of those warning devices.

The Nyes' final argument against pre-emption is related and rests primarily on semantics. They contend that the regulations do not apply because the Buckeye Crossbuck Program is experimental in nature and therefore not a "crossing improvement project." While the Buckeye Crossbuck Program utilized and studied an experimental Buckeye Crossbuck in comparison to a new, state-of-the-art Standard Crossbuck, this does necessarily prevent it from being a "crossing improvement project." The entire thrust behind the project was to improve safety at railroad grade crossings. (Kirkland Aff., Exh. A; Docket # 87, Exh. A). Moreover, the Nyes do not suggest that the project was intended to decrease safety at railroad crossings or that pre-emption can only occur where warning devices installed with

federal funds actually increase safety. Accordingly, despite the fact that the Buckeye Crossbuck Program was intended to evaluate the relative effectiveness of two different warning devices, it was still a crossing improvement project. Even if it were determined to be purely an experimental study and so precluded, as a definitional matter, from being an improvement project, this would have no effect on pre-emption as the regulations themselves are not limited to grade crossing improvements. 23 C.F.R. § 646.206.[5] Thus, regardless of the program's characterization, pre-emption applies to this federally funded state project, which was intended to explore "cost effective improvements for reducing the accident problem at passive railroad-highway grade crossings." (Kirkland Aff., Ex. A, at 1).

As federal law and regulations preempt plaintiffs' state tort claims based on the alleged inadequacy of the warning devices at the Hough Road crossing, CSXT is entitled to partial judgment of law in its favor on its affirmative defense pre-emption. If CSXT properly installed and maintained the Standard Crossbucks at the Hough Road crossing, plaintiffs are precluded from arguing that the warning devices themselves were inadequate or defective.

## B. Reflectivity of CSXT'S Train Cars

■ CSXT also argues, in its motion, that the Nyes' tort claims are preempted by federal law to the extent that they are based on allegations that CSXT's trains had "insufficient lights and/or reflector strips." The Nyes concede that state tort arguments related to the placement of reflective materials on train locomotives is pre-empted by federal law. (Docket # 73, at 18 n. 10).[6] The parties dispute, howev-

---

**5.** In addressing the applicability of the regulations, section 646.206 states that "projects for the elimination of hazards … of railroad crossings *may include but are not limited to*

… grade crossing improvements." (emphasis added).

**6.** *See Napier v. Atlantic Coast Line R.R.,* 272 U.S. 605, 613, 47 S.Ct. 207, 71 L.Ed. 432

er, whether or not the plaintiffs' claims related to the lack of "reflector strips" on CSXT's rail cars, as opposed to the locomotive, is pre-empted by the Federal Railroad Safety Act of 1970 ("FRSA"), 49 U.S.C. § 20101, *et seq.*[7] As discussed above, FRSA includes an express pre-emption and savings clause which provides

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement . . .

Despite 1994 legislation directing the Federal Railway Administration ("FRA") to examine railroad car visibility, specifically "the use of reflective materials," and to adopt regulations accordingly, 49 U.S.C. § 20148, no such regulations have yet been adopted. Thus, it is clear that state tort law, with respect to reflectorization, has not been expressly pre-empted.

▆ CSXT argues that state tort law has nevertheless been impliedly pre-empted because of the FRA's previous consideration of this issue and its failure to adopt any pertinent regulations. The United States Supreme Court has recognized a form of implied or negative pre-emption when a federal agency has determined that no regulation is appropriate. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). Under this doctrine, the failure of the agency to affirmatively "exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved

pursuant to the policy of the statute" thereby preventing States from using their police power to enact such a regulation. *Id.* In *Norfolk & Western Railway Co. v. Public Utilities Comm'n of Ohio*, the Sixth Circuit applied this doctrine in finding that a PUCO regulation concerning walkways on railway bridges and trestles had been negatively pre-empted by the FRA's purposeful decision not to implement a national regulation requiring railroad walkways on bridges. 926 F.2d 567, 571–72 (1991).

In this case, unlike *Norfolk & Western*, the FRA has not spoken with such clarity or consistency so as to support a finding of negative preemption. On 13 April 1981, the National Transportation Safety Board ("NTSB") recommended that the FRA

> Develop and issue an advance notice of proposed rulemaking within 6 months inviting comments on the improvement of nighttime train car and locomotive visibility at grade crossings to aid in preventing accidents in which motor vehicles run into the sides of trains at night. Comments regarding the potential benefits of applying reflective devises or materials to the sides of train cars and locomotives should be particularly solicited.
>
> . . . [and]
>
> [P]lan and institute a research program to establish criteria for reflectorization devices and materials for installation on the sides of train cars and locomotives. Such criteria should be designed for use in either voluntary or mandatory programs.

46 Fed.Reg. 34734 (July 2, 1981). In May 1982, the FRA was still considering the

---

(1926); and *Springston v. Consolidated Rail Corp.*, 130 F.3d 241, 245 (6th Cir.1997).

**7.** While CSXT also states that plaintiffs' claims regarding "insufficient lights" on its rail cars should be pre-empted, it fails to

really argue that point or provide any support for that argument. Accordingly, its motion is denied with respect to the lighting on its rail cars, and the Nyes' motion for summary judgment is granted on this point.

possibility of rulemaking on reflectorization but was waiting to review a "study currently underway to evaluate the benefits and costs of reflectorization as a means of improving rail-highway crossing safety." 47 Fed.Reg. 21941 (May 20, 1982). Ultimately, this study reported that "although the use of reflective material enhanced railcar conspicuity, the reflective material was not durable enough to withstand the harsh railroad environment." 66 Fed.Reg. 54326 (October 26, 2001). Beginning in 1990, however, the FRA conducted additional research in response to improvements in the retroreflective qualities and durability of reflective materials. *Id.* While continuing its research, the FRA, following a mandate from Congress pursuant to Federal Railroad Safety Authorization Act of 1994, prepared to "initiate a rulemaking to prescribe regulations requiring enhanced visibility standards for railroad cars." *Id.* After extensive analysis, the FRA concluded that

> because of technological advances developed since 1982, the reflectorization of railroad freight equipment appears to be a viable and cost-effective method of reducing the number of collisions at highway-rail grade crossings and the casualties and property damages which result from those collisions. FRA's analysis supports the conclusion that declines in the cost of reflective material, in combination with better performance and lower maintenance costs, have created a situation in which the benefits of reflectorization now appear to exceed its costs.

*Id.*

While the FRA's ultimate conclusion that the benefits of the reflectorization exceeded the costs occurred after Joshua Nye's accident, the ongoing analysis and equivocation on the part of the FRA demonstrates that it did not affirmatively exercise its authority in determining the reflectorization on train cars was not warranted or appropriate. Such vacillation and uncertainty is quite unlike the FRA's explicit refusal to adopt the walkway regulation at issue in *Norfolk & Western.* Thus, consistent with the presumption against federal pre-emption embodied in the saving clause of 49 U.S.C. § 20106, *Tyrrell v. Norfolk Southern Ry. Co.,* 248 F.3d 517, 524 (6th Cir.2001) (citing *Easterwood,* 507 U.S. at 665, 113 S.Ct. 1732), state tort law on the issue of "reflector strips" and reflectorization has not been negatively or impliedly pre-empted by federal law. Accordingly, the Nyes are entitled to summary judgment on CSXT's affirmative defense of pre-emption with respect to their state tort theories based on the lack of reflector strips or insufficient reflectorization.

## IV.  CONCLUSION

Defendants' motion, construed as a motion for partial summary judgment on its affirmative defense of pre-emption, is granted with respect to the adequacy of the warning device at the Hough Road crossing but denied as to plaintiffs' theory of negligence based on insufficient lights and/or reflector strips on the rail cars. If CSXT properly installed and maintained the Standard Crossbucks at the Hough Road crossing, plaintiffs are pre-empted from arguing that the warning devices themselves were inadequate or defective.

Plaintiffs' motion for partial summary judgment on defendants' affirmative defense of pre-emption is granted with respect to their theory of negligence based on insufficient lights and/or reflector strips on the rail cars but denied as to the adequacy of the warning devices at the Hough Road crossing. Plaintiffs are not pre-empted from pursuing a negligence theory

**540**

based on insufficient lights and/or reflector strips on CSXT's rail cars.

IT IS SO ORDERED.