

**FILED**

Sep 30 2015, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Robert W. Johnson
Travis N. Jensen
Johnson Jensen LLP
Indianapolis, Indiana

Anthony W. Patterson
Parr Richey Obremskey Frandsen
Lebanon, Indiana

ATTORNEY FOR APPELLEES:
CSX TRANSPORTATION, INC.,
GERALD KONZ, AND CODY COOPER

Sarah N. Snoeberger
Stuart & Branigin LLP
Lafayette, Indiana

ATTORNEY FOR APPELLEES:
BOONE COUNTY COMMISSIONERS
AND BOONE COUNTY HIGHWAY
DEPARTMENT

Paul T. Belch
Travelers Staff Counsel
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:
STATE OF INDIANA AND THE INDIANA
DEPARTMENT OF TRANSPORTATION

Gregory F. Zoeller
Attorney General of Indiana

Kristin Garn
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joan E. Gochenour and James E. Gochenour, *Appellants-Plaintiffs,* <br><br> v. <br><br> CSX Transportation, Inc., Gerald Konz, Cody Cooper, | September 30, 2015 <br><br> Court of Appeals Case No. 06A01-1407-CT-276 <br><br> Appeal from the Boone Superior Court <br> The Honorable Matthew C. Kincaid, Judge <br> Trial Court Cause No. 06D01-1112-CT-639 |

Boone County Commissioners,
Boone County Highway Dept.,
State of Indiana, and the Indiana
Department of Transportation,

*Appellees-Defendants*

**Robb, Judge.**

# Case Summary and Issues

[1] Defendants CSX Transportation, Inc., Gerald Konz, and Cody Cooper (collectively, "CSXT"); the Boone County Commissioners and Boone County Highway Department (collectively, "Boone County"); and the State of Indiana and Indiana Department of Transportation (collectively, "the State"), moved for summary judgment on Joan and James Gochenour's complaint for damages for injuries Joan sustained in a car versus train accident. The trial court ultimately granted summary judgment on all claims to all defendants,[1] and the Gochenours appeal, raising the sole issue of whether summary judgment was proper. We conclude the Gochenours' inadequate warning device claims, in all their iterations, are preempted by federal law. We also conclude that a genuine issue of material fact exists regarding whether CSXT failed to provide an

---

[1] The trial court issued three separate summary judgment orders as to the three defendants on three different dates, and the Gochenours filed a Notice of Appeal as to each. At the Gochenours' request, this court consolidated the three appeals under this single cause number.

unobstructed view at the crossing as required by law due to lack of vegetation control.  Therefore, we affirm the trial court's grant of summary judgment to Boone County and the State in full.  We affirm the trial court's grant of summary judgment to CSXT in part, and reverse and remand for further proceedings in part.

# Facts and Procedural History

[2]  On the afternoon of August 2, 2011, Joan was a passenger in a vehicle driven by Alice Schooler.  The vehicle was traveling eastbound on the Boone/Hendricks County Line Road which intersects a single track grade crossing at an angle ("County Line Crossing").[2]  The railroad crossing is marked by standard reflectorized crossbuck signs.[3]  As the vehicle crossed the railroad track, it collided with a southbound train operated by CSXT.  Konz and Cooper are employees of CSXT.  Schooler and another passenger were killed, and Joan was seriously injured.

[3]  On December 6, 2011, the Gochenours filed a complaint against the Estate of Alice Schooler alleging negligence in the operation of the vehicle.[4]  On January

---

[2] The Boone/Hendricks County Line Road is an east/west road.  The railroad track runs more or less northwest/southeast.

[3] As described by the Supreme Court, crossbucks are the "familiar black-and-white, X-shaped signs that read 'RAILROAD CROSSING.'"  *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 350 (2000).

[4] On November 8, 2013, the trial court approved a joint stipulation dismissing the Estate of Alice Schooler from the action.

11, 2013, the complaint was amended to add CSXT, Boone County, and the State as defendants[5] and to allege additional causes of action. Relevant to this appeal, the Gochenours alleged as to CSXT that the County Line Crossing "was and is extra-hazardous and [CSXT was] careless and negligent in failing to provide and maintain appropriate warnings, signals, automatic gates, sight distance, vegetation control, and other protective devices for the safety of the traveling public." Appendix of Appellants at 83.[6] As to Boone County and the State, the Gochenours alleged that the County Line Crossing "was and is extra-hazardous" and Boone County and the State were careless and negligent "in failing to provide appropriate design, warnings, signals, automatic gates, sight distance, vegetation control, and other protective devices at the [County Line Crossing] and/or to close the crossing" and were further careless and negligent "in failing to maintain and repair appropriate design, warnings, signs, sight distance, vegetation control, and pavement markings at or near the [County Line Crossing], and in failing to properly maintain the roadway at the crossing." *Id.* at 84-85.

[4]     On June 4, 2013, CSXT filed a motion for summary judgment on each of these claims. Boone County and the State eventually joined in CSXT's motion for

---

[5] The Gochenours also sued the Town of Jamestown and Hendricks County. The trial court granted summary judgment to these defendants, and the Gochenours do not appeal that summary judgment order.

[6] The Gochenours alleged three additional theories of liability against CSXT: failure to sound the train's horn as it approached the crossing, operating at too fast a speed, and failing to slow or stop to avoid a hazard. As evidence on each point was designated during the summary judgment proceedings, the Gochenours conceded CSXT was not liable under any of these theories, and they are not at issue herein.

summary judgment. Several rounds of summary judgment briefing and designation of evidence by both sides followed. After a hearing, the trial court entered the following order on June 4, 2014, granting CSXT's motion for summary judgment:

> 1. There is no genuine issue of material fact and [CSXT is] entitled to judgment as a matter of law, on all theories [the Gochenours] have advanced.
>
> 2. In particular, prior to the accident, reflectorized crossbucks had been installed with federal funds under a project approved by the Federal Highway Administration. Accordingly, federal law preempts [the Gochenours'] claims that negligence on the part of [CSXT] can be predicated on the failure to install additional traffic warning devices, *i.e.*, that the crossing was "extrahazardous," "ultra-hazardous," and "unusually dangerous," and therefore needed automatic gates and flashing light signals. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993); *Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344 (2000); *Randall v. Norfolk S. Ry. Co.*, 800 N.E.2d 951 (Ind. Ct. App. 2003), *trans. denied*.
>
> 3. Further, the undisputed evidence establishes that no failure to provide adequate sight distance/vegetation control caused the accident.
>
> 4. Further, the undisputed evidence shows that [CSXT] did not gratuitously assume a duty of care for the safety of the crossing.
>
> IT IS THEREFORE ORDERED by the Court that summary judgment be, and hereby is, GRANTED in favor of [CSXT].
>
> THE COURT FURTHER FINDS, pursuant to Ind. Trial Rule 54(B), that there is no just reason for delay and HEREBY DIRECTS ENTRY OF JUDGMENT in favor of [CSXT] and against [the Gochenours].

App. of Appellants at 16-17. An order granting summary judgment for the State followed on June 23, 2014,[7] and an order granting summary judgment in favor of Boone County was entered on July 23, 2014.[8] The Gochenours appeal the grant of summary judgment to these remaining defendants.

# Discussion and Decision

## I. Summary Judgment Standard of Review

[5] The party moving for summary judgment must "affirmatively negate an opponent's claim" by demonstrating that the designated evidence raises no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (internal quotation marks and citation omitted); *see also* Ind. Trial Rule 56(C). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact in order to preclude summary judgment. *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012).

---

[7] This order is nearly identical to the order granting summary judgment to CSXT. *Id.* at 18-19.

[8] This order is slightly different from the orders granting summary judgment to CSXT and the State, but is essentially the same in substance, finding "there is no genuine issue of material fact but that federal funds participated in the installation of the allegedly inadequate crossbuck warning devices where the accident occurred, [and the Gochenours'] claim is preempted and [Boone County] cannot be held liable as a matter of law for injuries arising from the devices['] claimed inadequacy." *Id.* at 20-21.

We review an order for summary judgment de novo, which is the same standard of review applied by the trial court. *Hughley*, 15 N.E.3d at 1003. When the trial court has granted summary judgment to the moving party, the nonmoving party has the burden on appeal of persuading us that the grant of summary judgment was in error. *Id.* However, "we carefully assess the trial court's decision to ensure that [the nonmoving party] was not improperly denied his day in court." *Id.* In reviewing the record, we consider only the evidentiary matter the parties have designated to the trial court, *see* T.R. 56(C), (H), and we construe all reasonable inferences in favor of the nonmoving party, *Hughley*, 15 N.E.3d at 1003. "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (quoting *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009)).

Indiana's heightened summary judgment standard "consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id.* at 1004.

## II. Inadequate Warning Devices Claims

The Gochenours assert the trial court erred in finding there was no genuine issue of material fact regarding whether the warning devices at the County Line Crossing were installed with federal funds and determining as a matter of law that their inadequate warning device claims against CSXT, the State, and

Boone County were preempted by federal law. They also assert that even if the trial court did not err in this finding, a jury should be allowed to determine whether CSXT gratuitously "assumed a duty of safety" to provide additional warning devices at the County Line Crossing, precluding its federal preemption affirmative defense. Brief of Appellants at 13-14.

## A. Federal Preemption of State Negligence Claims

In 1970, Congress enacted the Federal Railroad Safety Act ("FRSA") "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To aid in developing solutions to railroad grade crossing safety problems, the FRSA provides that the Secretary of Transportation "as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing [existing] laws and regulations . . . ." 49 U.S.C. § 20103(a).

In 1973, Congress enacted the Highway Safety Act, which in part made federal funds available to the states to eliminate the hazards at railroad-highway crossings. *See* 23 U.S.C. § 130 (the "Crossings Program"). As a prerequisite to receiving federal funds under the Crossings Program, the states must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d). The schedule must at a minimum provide signs for all crossings. *Id.* Additional conditions on the states' use of federal funds to improve crossings

are set out in regulations promulgated by the Secretary through the Federal Highway Administration ("FHWA"). *See* 23 C.F.R. §§ 646, 655, 924, 1204.

[11] The FRSA contains an explicit preemption clause:

> (1) Laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable.
> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement. . . . .

49 U.S.C. § 20106(a). Courts are reluctant to find preemption unless "it is the clear and manifest purpose of Congress." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (internal quotation marks and citation omitted). The restrictive language of the FRSA preemption clause dictates that, to preempt state law, the federal regulation must "cover" the same subject matter, and not merely "'touch upon' or 'relate to' that subject matter." *Id.*; *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (preemption clause in Airline Deregulation Act using the term "relating to" has broad preemptive scope). In *Easterwood*, the Supreme Court determined that, of the regulations promulgated to address railroad crossing safety, only the regulations found at 23 C.F.R. §§ 646.214(b)(3) and (b)(4) ("subsections (b)(3) and (b)(4)") preempt state law. Those regulations displace state and private decision-making authority by establishing a mandatory federal law requirement that particular warning devices be installed or federal approval obtained when federal funds participate in the installation of the warning devices, "effectively set[ting] the terms under which railroads are to participate in the improvement of crossings." *Id.* at 670.

[12] Subsections (b)(3) and (b)(4) address the adequacy of warning devices installed under the Crossings Program. *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 348-49 (2000). If certain conditions exist, such as multiple main line railroad tracks or high speed trains, the warning devices are deemed adequate if they "include automatic gates with flashing light signals . . . ." 23 C.F.R. § 646.214(b)(3)(i).[9] When none of those conditions exist, a warning device is deemed adequate if it has been approved by the FHWA. 23 C.F.R. § 646.214(b)(4). In short:

> [A]t crossings where any of the conditions listed in (b)(3) exist, adequate warning devices, if installed using federal funds, are automatic gates and flashing lights. And where the (b)(3) conditions are not present, the decision of what devices to install is subject to FHWA approval.

*Shanklin*, 529 N.E.2d at 349. In sum, "state law is preempted only if either subsection (b)(3) or (b)(4) applies, and those subsections apply only if federal funds participated in the installation of traffic warning devices at a particular crossing." *Ind. R.R. Co. v. Davidson*, 983 N.E.2d 145, 149 (Ind. Ct. App. 2012), *trans. denied*.

[13] Despite establishing that when subsections (b)(3) and (b)(4) apply, they "cover the subject matter of state law which . . . seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings," *Easterwood* ultimately concluded that the plaintiff's state law claim in that case was not

---

[9] "In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the . . . requirements [of § 214(b)(3)(i)] are not applicable." 23 C.F.R. § 646.214(b)(ii).

preempted because the railroad had failed to prove that the preconditions for application of either subsection (b)(3) or (b)(4) had been met. 507 U.S. at 671-72. Thereafter, a conflict among the United States Courts of Appeal arose as to when subsections (b)(3) and (b)(4) are applicable. *Compare, e.g.*, *Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 865 (11th Cir. 1998) (holding that federal funding of railroad crossing improvement triggers preemption under FRSA), *with Shots v. CSX Transp., Inc.*, 38 F.3d 304, 308-09 (7th Cir. 1994) (holding that participation of federal funds in railroad crossing improvement project was insufficient to trigger preemption; instead, there must also be some evidence that the Secretary actually approved the specific warning devices that were installed). The Supreme Court answered that question in *Shanklin*, holding that subsections (b)(3) and (b)(4) are applicable to all warning devices installed with federal funds:

> When the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject. At that point, the regulation dictates "the devices to be installed and the means by which railroads are to participate in their selection." It is this displacement of state law concerning the devices' adequacy, and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) . . . that pre-empts state tort actions. Whether the State should have originally installed different or additional devices, or whether the conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, is immaterial to the pre-emption question.
>
> It should be noted that nothing prevents a State from revisiting the adequacy of devices installed using federal funds. States are free to install more protective devices at such crossings with their own funds or with additional funding from the FWHA. What States cannot do—

once they have installed federally funded devices at a particular crossing—is hold the railroad responsible for the adequacy of those devices.

529 U.S. at 357-58 (citations omitted).  Our court has summarized the *Shanklin* decision as standing for "the broader proposition that preemption attaches when federal funds are spent on any of the traffic control devices at the grade crossing.  Once preemption attaches, a plaintiff's inadequate warning device claim against the railroad must be dismissed."  *Davidson*, 983 N.E.2d at 150.

## B.  Summary Judgment

### 1. Federal Funding

[14]  Federal preemption is an affirmative defense, and therefore CSXT bears the burden of proof.[10]  *See Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1125 (Ind. 2010); *see also Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010).  The Gochenours contend that CSXT's designated evidence fails to prove that federal funds participated in the installation of the crossbuck warning signs at the County Line Crossing.[11]  As federal funding is

---

[10] CSXT took the lead in the summary judgment proceedings, with Boone County and the State merely joining in CSXT's motion.  If the Gochenours' inadequate warning device claims are preempted, they are preempted as to all state law tort claims against all defendants because final authority for the warning devices rests solely with the federal government.  *See Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 747 (7th Cir. 2005) (affirming grant of summary judgment to railroad and county defendants upon finding preemption).  Because all three judgments rest on the evidence designated by CSXT, for clarity, we will refer only to CSXT throughout this discussion.

[11] Throughout their brief, the Gochenours refer to CSXT's obligation to meet a "4-Part Test" for preemption.  *See, e.g.*, Br. of Appellants at 19 ("The crystal clear, incontrovertible and essential first test—that must be satisfied before any further analysis of whether or not FRSA preempts state law is necessary—is a 4-Part Test: State Law is preempted only if:  1. Federal Funds participated in the; 2. Installation of; 3. Traffic Warning Devices at a; 4. Particular Crossing.").  Although we do not disagree with the general statement of when

the touchstone of preemption, the Gochenours contend that the trial court erred in granting summary judgment to CSXT on the basis that their inadequate warning devices claim was preempted.

[15] The evidence CSXT designated in support of its motion for summary judgment—over the course of its original and several supplemental designations—included: the affidavit of Thomas Rueschhoff, the Senior Rail Projects Engineer for the Indiana Department of Transportation ("INDOT"), which is the successor to the Indiana State Highway Commission. In his position, Rueschhoff is the custodian of documents retained by INDOT relating to a passive protection program that was initiated in the late 1970s.[12] As part of that program, the State and CSXT[13] entered into an agreement (the "State/CSXT Agreement") to install new crossbuck signs at CSXT railroad crossings throughout the state. These documents "are records of acts or events made at or near the time by a person with knowledge thereof[, and] [i]t was the regular practice of these agencies to make and keep such records in the course of their regularly scheduled business activities." App. of Appellants at 109.

_____

preemption attaches, the Gochenours appear to have phrased it in a way to make it seem more onerous and complicated than it is.

[12] Traffic control devices may be active or passive. Active warning devices are those "activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train." 23 C.F.R. § 646.204. Passive warning devices include "signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." *Id.*

[13] At the time, CSXT was Consolidated Rail Corporation ("Conrail"). For ease of reference, we will refer to all iterations of the railroad as CSXT throughout this opinion.

Attached to the Rueschhoff affidavit are two exhibits attested to be true and complete copies of certain documents retained by INDOT with respect to this program. *Id.* Exhibit 1 is a copy of the State/CSXT Agreement that begins:

> WHEREAS, the Highway Safety Act of 1973 requires that the State conduct and maintain a survey to identify problem rail-highway crossing locations on all highways and establish and implement a priority schedule of improvements, and
> WHEREAS, this Act also requires, as a minimum, that all railroad crossings be properly signed and marked, and authorizes Federal funding for such program, and
> WHEREAS, the State and the Railroad, in the interest of public safety, desire to participate in this program to upgrade the passive warning devices at the Railroad's public rail-highway crossings in Indiana to minimum standards . . . , and
> WHEREAS, under [Indiana law], the Indiana State Highway Commission is authorized, "to cooperate with the United States Government under any Federal law in any manner necessary to secure for the State of Indiana the proportion of any Federal appropriation which may be made in the future".

*Id.* at 112 (citation omitted). Pursuant to this agreement, CSXT was to install crossbucks at its crossings, and the State was to reimburse the railroad for ninety percent of its cost: "Upon receipt of the final bill, the State shall promptly reimburse the Railroad for such items of work and expense, in such amounts as are proper and eligible for payment from Federal funds . . . ." *Id.* at 114. The agreement concludes that it "shall be binding upon the parties hereto, their successors or assigns, and shall not be effective unless and until approved by the Division Engineer of the Federal Highway Administration." *Id.* at 117. The agreement was signed by the Division Engineer on behalf of the FHWA on September 26, 1979. Documents attached to the agreement estimating the

supplies and cost to implement the program show the installation was to be done under "W. O. #42468." *Id.* at 124-25.

[16] Exhibit 2 to Rueschhoff's affidavit is a form titled "Letter of Approval and/or Authorization" from the U.S. Department of Transportation – Federal Highway Administration for Federal Aid Project No. RRP-000S(26), addressed to the Chief Highway Engineer of the Indiana State Highway Commission and dated November 2, 1979. *Id.* at 133. The form authorizes the acquisition of crossbuck and multiple track signs and the installation of those signs by CSXT at "[a]ll public rail-highway at-grade crossings on the [CSXT] system." *Id.* The form specifically references the State/CSXT Agreement that was approved by the FHWA on September 26, 1979. *Id.*

[17] CSXT also designated the affidavit of Ralph Whitaker, a CSXT employee of at least fourteen years at the time of his affidavit. In his positions as Track Supervisor, Roadmaster, and Engineer of Track, Whitaker "became familiar with the record-keeping practices" of CSXT. *Id.* at 134. Attached to Whitaker's affidavit are two exhibits which he averred were exact copies of documents retrieved from CSXT's permanent records and which were made in the regular course of business at or near the time of the events recorded. Exhibit 1 is a copy of the State/CSXT Agreement described above. Exhibit 2 is a CSXT "Daily Participation Project Report" which shows that on July 26, 1982, three CSXT employees installed road crossing posts and signs under work order number 42468 at four crossings, including crossing 543038W. *Id.* at 153.

Crossing 543038W is commonly known as the County Line Crossing.  *Id.* at 135.[14]

[18]   CSXT subsequently supplemented its designation of evidence with the affidavit of Milton Vermillion, who retired from CSXT with thirty years of railroad experience with CSXT and its predecessors.  Vermillion was a member of the "'Crossbuck Gang,' responsible for installing the new crossbuck signs and posts under the State project."  *Id.* at 313.  Vermillion worked on the Crossbuck Gang for the entire two and one-half years it took to complete the installations.  Attached to his affidavit is the "Daily Participation Project Report" previously attached to Whitaker's affidavit.  Vermillion noted that he had personally participated in the installation of crossbuck signs at the County Line Crossing on July 26, 1982, and had signed the report on that date.

[19]   Finally, CSXT designated the affidavit of Carl Sanders, the former Administrative Manager for the Indiana division of the FHWA.  Attached to

---

[14] The Gochenours filed a Motion to Strike portions of the Rueschhoff and Whitaker affidavits for lack of personal knowledge.  It does not appear that the motion was ever ruled on by the trial court.  The Gochenours challenge the personal knowledge supporting these two affidavits on appeal as well, claiming the affiants "lack the requisite personal knowledge to make the key statements contained in their affidavits."  Br. of Appellants at 27.  Specifically, the Gochenours challenge the conclusions the affiants made based on their own review of the documents rather than on any personal knowledge of what happened in 1979 through 1982.  The Gochenours' own designated evidence—the deposition testimony of Rueschhoff and Whitaker— was directed to this lack of personal knowledge.  However, as proponents of the documents attached to their affidavits, both affiants affirmed their familiarity with the recordkeeping practices of their respective employers and the authenticity of the documents.  We can rely on the content of the documents themselves and need not consider the affiants' factual statements about what the documents purport to show.  *See* Ind. Evidence Rules 803(6), (8), and (16) (exceptions to the hearsay rule for records of regularly conducted activity, public records, and statements in ancient documents), and 902(4) and (11) (self-authenticating evidence).

his affidavit are several documents which he had obtained from the FHWA archives and which he averred were true and accurate copies of reports of a public office setting forth its regularly conducted and recorded activities. *Id.* at 341. Exhibit 2 is a "Final Voucher for Work Performed Under Provisions of the Federal Aid and Federal Highway Acts, as Amended," referencing "Project No. RRO-RRP-000S(026)." *Id.* at 344.[15] The voucher was submitted by INDOT on July 18, 1991, and signed by an authorized state officer certifying "that the costs shown in this voucher have been incurred in accordance with terms of project agreements . . . ." *Id.* The voucher was signed on September 9, 1991, by Sanders as the "Authorized FHWA Representative" certifying "that supporting records for costs claimed, and the referenced project (if applicable), have been subjected to required reviews, approvals and inspections by the Federal Highway Administration and that the amount approved is justly due." *Id.* Sanders averred that his signature on the voucher "is evidence of the fact that the FHWA had given its Final Acceptance of the work done under the Project" and showed that "federal funds in the amount of $1,911,780.28 were paid to Indiana" under the project. *Id*. at 342. That amount represents ninety percent of the "total participating cost." *Id.* at 344.[16]

---

[15] Sanders explained that Project RRP-RRO 000S(026) was also sometimes referred to as RRO-RRP 000S(026). *Id.* at 341. "RRO" stands for off system roads and "RRP" stands for primary system roads. *Id.* at 341 n.1.

[16] No funds were actually paid pursuant to the voucher because the amounts had previously been paid.

[20] Exhibit 3 to Sanders's affidavit is a U.S. Department of Transportation "Inspection Report" dated October 27, 1987, for Project No. RRP-RRO-000S(26) describing the project being inspected as "consist[ing] of the installation and upgrading of the passive warning devices at the public rail-highway crossing[s] in Indiana by [CSXT] under work order No. 42468." *Id.* at 347. The report indicates a "15% random sample" of crossings in the Crawfordsville and Greenfield Districts was inspected, and "[a]ll crossbucks were generally found to be installed satisfactorily." *Id.*[17] Attached to the inspection report was a list of the crossings inspected on that date and the condition of the crossbucks and posts. One of the crossings inspected was the County Line Road crossing in Jamestown, which was found to be "o.k." *Id*. at 348.

[21] The Gochenours strongly dispute that this designated evidence comes "anywhere close" to proving that federal funds participated in the installation of the crossbucks at the County Line Crossing. Br. of Appellants at 31. They argue the evidence is "woefully inadequate" because there is no evidence that the federal funds referenced by the voucher were "specifically expended to install specific warning devices at the County [Line] Crossing" and therefore a "necessary link" is missing. *Id.* at 12, 31. We do not believe the level of specificity the Gochenours advocate is required. The Gochenours "suggest"

---

[17] The report indicates any crossings not included in this random sample inspected by the federal area engineer would be visited by staff of the Crawfordsville and Greenfield Districts "within the next few weeks." *Id.*

evidence CSXT could have produced to meet the burden of establishing that federal funds participated in the installation of the County Line Crossing warning signs:  proof that federal funds were received by the State and placed into a special account, the State issued a check or made some other transfer of funds to pay for a specific traffic warning device, and that specific traffic warning device was installed at a specific location.  *See id.* at 22-23.  That other evidence might be available does not necessarily mean the designated evidence is insufficient.  CSXT installed passive warning signs at hundreds of crossings as part of the passive protection project undertaken pursuant to the State/CSXT Agreement.  *See* App. of Appellants at 123 (estimate attached to State/CSXT Agreement that "871 [n]ew posts and crossbucks to be installed at locations where none presently exist.  2759 [n]onstandard existing posts and crossbucks installations to be removed and replaced with new posts and crossbucks.").  It is unlikely funds in a project of this scope would be earmarked to pay for each specific sign and post that would then be tracked to a specific crossing.  If CSXT—or any railroad—were required to prove the use of federal funds at the micro level the Gochenours contend is necessary, federal funding could basically never be proved.  The Gochenours cite to *Easterwood* as support for the "high level of specificity with which federal funds must be tracked to specific expenditures on specific items."  Br. of Appellants at 24.  They read *Easterwood* too narrowly.  *Easterwood* decided that subsections (b)(3) and (b)(4) "were not applicable because the warning devices for which federal funds had been obtained were never actually installed at the crossing," rather than because of a failure to specifically prove federal funding.  *Shanklin*, 529 U.S. at 353.

*Easterwood* does not support the Gochenours' argument that funds must be tracked to a specific *installed* device.

[22] The Gochenours also seem to imply that because they designated evidence in response to CSXT's motion, summary judgment is inappropriate, citing to *Hughley*, 15 N.E.3d at 1005-06. *See* Br. of Appellants at 15 n.13 (quoting *Hughley*: "Because [the nonmoving party] designated competent evidence in response to the [moving party]'s motion for summary judgment, weighing it— no matter how decisively the scales may seem to tip—was a matter for trial, not summary judgment."). In *Hughley*, the State sought summary judgment in a forfeiture proceeding, designating evidence that when defendant was arrested for dealing cocaine, he had over $3,000 in his pocket. By statute, that makes a prima facie case for forfeiture of the cash. The defendant then designated his own "perfunctory and self-serving" affidavit in which he stated that the cash was neither the proceeds of criminal activity nor intended to be used in furtherance of drug crimes. 15 N.E.3d at 1004. Our supreme court held that because the defendant had designated evidence aside from his pleadings that *specifically controverted* the State's prima facie case, he had at least minimally raised a genuine factual issue, and a trier of fact should resolve the differing accounts of the truth at trial. *Id.* The Gochenours' designated evidence is the deposition testimony of Whitaker and Rueschhoff in which they each acknowledge they have no personal knowledge of the actual installation of the

crossbucks at the County Line Crossing or of the transfer of federal funds.[18] This evidence does not, however, challenge their competence as proponents of the documentary evidence upon which CSXT relies to prove the participation of federal funds in the project that led to the installation of the crossbucks at the County Line Crossing, nor does it challenge the truthfulness or authenticity of those documents. The Gochenours' evidence, therefore, does not raise a *genuine* issue as to the material fact of federal funding because it does not specifically controvert CSXT's designated evidence and require the resolution of differing accounts of the truth.

[23] According to CSXT's designated evidence, the State of Indiana and CSXT entered into a joint agreement in 1979 to install or upgrade warning devices at CSXT's passive railroad crossings in Indiana. The agreement was approved by the FHWA in 1979, and the project was assigned a federal aid project number and a work order number. CSXT installed reflectorized crossbucks at the County Line Crossing on July 26, 1982, under the same work order number. In 1987, certain crossings—including the County Line Crossing—were randomly inspected by the U.S. Department of Transportation in conjunction with the same federal aid project and work order numbers and determined to be satisfactory. In 1991, the FHWA reviewed and approved the State of Indiana's

---

[18] The Gochenours designated the depositions of Rueschhoff and Whitaker in full, which does not meet the specificity requirements of Trial Rule 56(C). *See Filip v. Block*, 879 N.E.2d 1076, 1081 (Ind. 2008) ("Trial Rule 56(C) does compel parties to identify the 'parts' of any document upon which they rely. The Rule thus requires sufficient specificity to identify the relevant portions of a document, and so, for example, the designation of an entire deposition is inadequate.").

voucher for costs incurred under the same federal aid project number assigned to the State/CSXT project and paid nearly two million dollars to the State of Indiana, which represented ninety percent of the total cost of the project. It is clear from this evidence that federal funds participated in the installation of crossbucks at the County Line Crossing. In addition, even though this is not required to prove the defense of preemption, CSXT's evidence shows the FHWA *actually approved* the warning devices at issue.

[24] The Gochenours have not offered any evidence in opposition to CSXT's motion for summary judgment that would so much as suggest that the County Line Crossing crossbucks were not federally funded. Although they assert that CSXT's evidence alone creates the conflicting inferences that either some of the federal funds paid to the State were expended to install crossbucks at the County Line Crossing or none of them were, Br. of Appellants at 29, the latter inference falls into the category of practically anything being possible rather than being a *reasonable* inference from the evidence. As there is no factual dispute nor are there conflicting reasonable inferences to be drawn from CSXT's designated evidence, the Gochenours' claim regarding inadequate warning devices is preempted as a matter of law, and the trial court properly granted summary judgment to CSXT, Boone County, and the State on this claim.

## *2. Assumption of Duty*

[25] The Gochenours also contend that the trial court erred in granting summary judgment to CSXT on the basis of preemption because CSXT "assumed a duty

of safety" at the County Line Crossing and has therefore waived the preemption defense. *Id.* at 38.

[26] Indiana recognizes that a duty of care may arise where one would not otherwise exist if a party gratuitously or voluntarily assumes such a duty by affirmative, deliberate conduct. *Yost v. Wabash Coll.*, 3 N.E.3d 509, 517 (Ind. 2014). To impose liability for breach of an assumed duty, "it is essential to identify and focus on the specific services undertaken. Liability attaches only for the failure to exercise reasonable care in conducting the undertaking." *Id.* (internal quotation marks omitted). If the record contains insufficient evidence establishing such a duty, the court decides the issue as a matter of law. *Id.*

[27] The Gochenours contend their designated evidence raises at least an inference that CSXT undertook a duty to assure the safety of the County Line Crossing when it interacted with various local officials regarding a plan to increase train speeds in the area. The Gochenours point to evidence that CSXT appeared before the Jamestown Town Council, the Hendricks County Commissioners, and the Boone County Commissioners and discussed the possibilities for upgrading the County Line Crossing in conjunction with INDOT. Even if the evidence the Gochenours rely on could otherwise show that by appearing at these meetings, CSXT specifically and deliberately undertook the duty of safety,

maintenance, and operation at the County Line Crossing,[19] there is no merit to this argument.

[28] First, the case on which the Gochenours rely to support their claim that preemption protection can be lost by assuming a duty is inapposite. In *Medtronic, Inc. v. Malander*, 996 N.E.2d 412, 419 (Ind. Ct. App. 2013), the court held there *was no* preemption protection before examining whether the defendant had assumed a duty to the plaintiffs. Second, *Shanklin* made it clear that one of the effects of FRSA preemption is to absolve the railroad of state tort liability, which is exactly what the Gochenours seek to impose here, regardless of the terms in which they cast their claim. 529 U.S. at 357-58; *see also Randall v. Norfolk S. Ry. Co.*, 800 N.E.2d 951, 956 (Ind. Ct. App. 2003) (noting that plaintiff's attempt to avoid preemption by stating his negligence claims in terms of the railroad's duty to petition State and local authorities to upgrade warning devices at an allegedly extra hazardous crossing was ineffective because the claims "ultimately amount to an effort to hold the Railroad responsible for the adequacy of the warning devices"), *trans. denied*. Finally, *Shanklin* also made it clear that even if conditions have changed at a crossing where warning signs were installed with federal funds, such that gates and lights would now be appropriate, that "is immaterial to the pre-emption question." *Id.* at 358. Thus,

---

[19] Although CSXT appeared before all of these boards with a proposal to increase train speeds, our review of the designated evidence does not support the inference that CSXT ever offered, agreed, or took deliberate action to upgrade the County Line Crossing, instead consistently deferring to INDOT.

the increased train speed did nothing to alter the preemption of state law claims pertaining to the adequacy of the warning devices at the County Line Crossing.

[29] There is also no indication that the crossbucks at the County Line Crossing had in fact been upgraded with State or other funds since their initial installation in 1982, such that federal preemption might no longer apply and regular state tort law might resume. *Cf. Davidson*, 983 N.E.2d at 152 (concluding there was a genuine issue of fact regarding whether federal preemption continued to apply when crossbucks which had originally been installed with federal funds in 1978 had been replaced with state funds pursuant to an application which did not incorporate the federal plans from the earlier project and were not placed in the exact same location as those installed with federal funds). Although CSXT sent a letter to the Jamestown Town Council in late 2008 regarding the speed increase and stating that the "signals at the [affected Jamestown] crossings have been upgraded in preparation for the increase in train speeds," App. of Appellants at 545, the letter also indicated that the type of warning device at the County Line Crossing remained crossbuck signs. Vermillion attested in a second affidavit in support of CSXT's motion for summary judgment that the signs that were removed from the County Line Crossing after the accident were the same signs he had personally helped install in 1982. *Id.* at 515. Even if different warning devices should have been or should in the future be installed at the County Line Crossing, CSXT cannot be held liable for the adequacy of the existing warning devices.

For these reasons, the Gochenours' claim that CSXT assumed a duty to provide adequate warning devices at the County Line Crossing is preempted as a matter of law, and the trial court did not err in granting summary judgment to CSXT on this claim.

## III. Inadequate Sightlines Claims

The Gochenours' remaining claim is that there was inadequate sight distance and vegetation control at the County Line Crossing. Indiana Code section 8-6-7.6-1 requires a railroad to "maintain each public crossing under its control in such a manner that the operator of any licensed motor vehicle has an unobstructed view for fifteen hundred (1,500) feet in both directions along the railroad right-of-way subject only to terrain elevations or depressions, track curvature, or permanent improvements."

In support of its motion for summary judgment on this claim, CSXT[20] designated the affidavit of Gary Wolf, "an expert in analyzing locomotive event recorder printouts . . . ." App. of Appellants at 154. Wolf visited the scene of the accident on September 30, 2011—nearly two months after the accident

---

[20] Again, CSXT took the lead in the summary judgment proceedings, with Boone County and the State joining its motion, and we will again refer only to CSXT throughout this discussion. Although the Gochenours' brief focuses almost exclusively on CSXT with regard to these claims, they did allege in their complaint that both Boone County and the State were negligent in failing to provide and maintain appropriate sight distance and vegetation control at the County Line Crossing. *See* App. of Appellants at 84-85. The trial court specifically granted summary judgment to the State on this claim but does not mention this claim in the summary judgment order for Boone County. Nonetheless, there is nothing to indicate that the trial court was granting only partial summary judgment for Boone County, so in keeping with the trial court's other rulings, we assume the trial court granted summary judgment to Boone County on this claim as well.

occurred—and took a photograph "from the edge of [CSXT's] right-of-way" depicting a train 1,500 feet from the crossing. *Id.* at 156; *see also id.* at 170 (Exhibit 3, photograph). He avers he reviewed photographs taken by the Hendricks County Sheriff's Department on the day of the accident, and "[t]here were no material changes in the foliage or buildings in the relevant quadrant of the crossing" between the two dates.[21] *Id.* at 156.

[33] In response, the Gochenours' designated the affidavit of William D. Berg, Ph.D., P.E., who has "knowledge, training, and experience in civil engineering and highway-railroad crossings." *Id.* at 294. Berg's affidavit focuses on the engineering of the County Line Crossing and concludes that "the subject grade crossing was unduly, or more than ordinarily hazardous as of 2011 [and] the warning devices – crossbucks only – present at the County Line Crossing on the day of the Collision were inadequate." *Id.* at 295. The Gochenours also designated the affidavit of Frank Gentry, a resident of Boone County who is familiar with the County Line Crossing by virtue of driving across it in both directions approximately two to three times daily for thirty years. Gentry went to the railroad crossing two days after the accident and cut down tree limbs he alleges were hanging down to the rocks in the railroad bed and also removed a vine around a utility pole. He avers they "were obstructions to a driver's view and ability to see a train coming eastbound on the tracks." *Id.* at 289. Gentry

---

[21] The photographs taken by the Hendricks County Sheriff's Department do not appear in the record.

also reviewed Exhibit 3 to Wolf's affidavit – the photograph Wolf took of the view from the crossing on September 30, 2011. Gentry states it "is *not* a fair and accurate depiction of the trees, foliage, and vegetation as they existed on August 2, 2011 [because it] does not show the tree limbs [he] cut down and the vine that [he] cut down from the utility pole." *Id.* (emphasis in original).

[34] CSXT then designated the affidavit of John Trone, Road Foreman of Engines on the day of the accident. One of his responsibilities in that job was to respond to accidents and download data from the train's video and event recorders. Attached to Trone's affidavit were several still photographs taken from the train's video recorder immediately before the accident. *See id.* at 365-75. Trone states that the photos "show that there are no tree limbs 'hanging down and touching the rocks in the railroad bed[,]'" contrary to Gentry's affidavit. *Id.* at 351.

[35] Based upon this evidence, the trial court found that there was no genuine issue of material fact as to whether the failure to provide adequate sight distance and/or vegetation control caused the accident. *See id.* at 17. The Gochenours contend this was in error. First, the Gochenours point to Berg's expert opinion that the sight distance at the County Line Crossing was inadequate because of the physical configuration of the crossing, and therefore regulatory stop signs or automatic warning devices, rather than crossbucks, should have been installed. To the extent the Gochenours contend that CSXT, Boone County, and/or the State were negligent in failing to provide different or additional warning devices because of the configuration of the crossing, they essentially make an

inadequate warning device claim that is preempted by federal approval of the decision to install federally funded crossbucks. *See Shanklin*, 529 U.S. at 358-59; Part II., *supra*.

[36] To the extent the Gochenours rest their claim on the issue of vegetation control, however, we agree that the trial court erred in granting summary judgment to CSXT.[22] Federal regulations dictate that "[v]egetation on railroad property which is on or immediately adjacent to [the] roadbed shall be controlled so that it does not ... [o]bstruct visibility of railroad signs and signals . . . ." 49 C.F.R. § 213.37(b). Although this regulation preempts "any state-law claim regarding vegetative growth *that blocks a sign* immediately adjacent to a crossing," *Shanklin v. Norfolk S. Ry. Co.*, 369 F.3d 978, 987 (6th Cir. 2004) (emphasis added), it does not preempt a claim alleging negligence in allowing vegetation to otherwise obscure safe lines of sight at a crossing, *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 490 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 905 (2014). Thus, the Gochenours' negligence claim for inadequate sightlines caused by overgrown vegetation is not preempted.

---

[22] Although the Gochenours' complaint alleges Boone County and the State also failed to provide and maintain adequate vegetation control at the crossing, they proceed on appeal only as to CSXT, citing a statute which imposes a duty only on a railroad and citing no authority imposing such a duty on a county or the State. Any claims as to Boone County and the State with regard to this issue are therefore forfeited. *See* Ind. Appellate Rule 46(A)(8)(a); *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015) ("A litigant who fails to support his arguments with appropriate citations to legal authority and record evidence waives those arguments for our review.").

[37]   Summary judgment is rarely appropriate in negligence cases. *Sparks v. White*, 899 N.E.2d 21, 23 (Ind. Ct. App. 2008). "This is because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004). Negligence consists of three elements: 1) a duty owed to the plaintiff by the defendant; 2) breach of that duty; and 3) injury proximately caused by that breach. *Sparks*, 899 N.E.2d at 23. Here, Indiana Code section 8-6-7.6-1 sets forth the duty to maintain the County Line Crossing such that there is a 1,500 foot unobstructed view of the tracks in each direction. The affidavits of Gentry, Wolf, and Trone present different versions of whether CSXT breached that duty by allowing the view of an oncoming train to be obscured by overgrown vegetation. CSXT argues that the photographs taken from its train's video recorder immediately before the accident are "unimpeachable photographic evidence" that positively contradict Gentry's affidavit, Brief of [CSXT] at 21, and prove that any overgrown vegetation "could not possibly have been a but-for cause of the accident," *id.* at 18. Pictures showing what those aboard the *train* could see do not prove what those in a *car* could see—which is the material fact here. "An issue of material fact is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth." *Hughley*, 15 N.E.3d at 1004 (internal quotation and citation omitted). The Gochenours' designated evidence raises a genuine issue of material fact because the conflicting affidavits about whether and where there were obstructions to the view of an oncoming train by an eastbound car create a factual issue that is best resolved by the fact-finder at trial.

# Conclusion

[38] No genuine issue of material fact exists as to the participation of federal funds in the installation of crossbuck signs at the County Line Crossing, and therefore the Gochenours' state law claims against CSXT, Boone County, and the State regarding inadequate warning devices are preempted by federal law. However, there remains a genuine issue of material fact to be resolved at trial regarding whether the duty to maintain an unobscured view for a motorist at the County Line Crossing has been breached by CSXT's failure to control vegetation within 1,500 feet of the crossing. The trial court's grant of summary judgment to Boone County and the State is therefore affirmed in full, and the grant of summary judgment to CSXT is affirmed in part and reversed in part. This case is remanded to the trial court for further proceedings consistent with this opinion.

[39] Affirmed in part, reversed in part, and remanded.

Bailey, J., and Brown, J., concur.